**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**
HELEN I. ZELDES (220051)
hzeldes@sshhzlaw.com
BEN TRAVIS (305641)
btravis@sshhzlaw.com
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 400-4990
Facsimile: (310) 399-7040

*Co-Lead Class Counsel*

[*Additional counsel listed on signature page*]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| In re TOLL ROADS LITIGATION | Case No:  8:16-cv-00262 ODW (ADSx) |
| _____ | District Court Judge: Otis D. Wright II<br>Magistrate Judge:  Autumn D. Spaeth |
| PENNY DAVIDI BORSUK, *et al.*, | |
| Plaintiffs, | **NOTICE OF MOTION AND MOTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS AND SERVICE AWARDS** |
| vs. | |
| FOOTHILL/EASTERN TRANSPORTATION CORRIDOR AGENCY, *et al.*, | Date:       January 4, 2022<br>Time:       10:00 a.m.<br>Location:  Judicate West<br>               (Via Zoom) |
| Defendants. | (**Referred to Special Master: Hon. Andrew J. Guilford (ret.)**)) |

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 4, 2022, at 10:00 a.m., or as soon thereafter as the matter may be heard, at Judicate West, 1851 East First Street, Suite 1600, Santa Ana, CA 92705 before the Honorable Andrew J. Guilford (Ret.), presiding as Special Master, Plaintiffs will and hereby do move the Court for an Order, awarding: (a) Service Awards to the Class Representatives totaling $125,000 for all three Settlements (between $15k and $23k to each Class Representative[1]); (b) Class Counsel's attorneys' fees in the amount of $20,737,500; and (c) unreimbursed expenses in the amount of $571,972.15. Please take notice that the hearing will take place remotely via Zoom. The access information for the hearing may be requested at the following link: https://tollroadssettlements.com/Request

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declarations of Helen I. Zeldes, Michael J. Flannery, and Blake J. Lindemann, the Class Action Settlement Agreement and Releases (the "Settlements") previously filed with the Court (Dkts. 585-4, 585-5, 594-3), and all papers filed in support thereof, the argument of counsel at the hearing of this Motion, all papers and records on file in this matter, and such other matters as the Court may consider.

---

[1] Service Awards requested for each Class Representative:

|        | Quarles | Carpenter | Myers  | Mahda  | Golka  | Borsuk | Coulter |
|--------|---------|-----------|--------|--------|--------|--------|---------|
| 3M     | 0       | 3,000     | 3,000  | 0      | 3,000  | 3,000  | 3,000   |
| TCA    | 15,000  | 15,000    | 15,000 | 15,000 | 15,000 | 15,000 | 15,000  |
| OCTA   |         |           |        |        | 5,000  |        |         |
| totals | 15,000  | 18,000    | 18,000 | 15,000 | 23,000 | 18,000 | 18,000  |

Dated: October 25, 2021

**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**

HELEN I. ZELDES (SBN 220051)
*hzeldes@sshhzlaw.com*
BEN TRAVIS (SBN 305641)
*btravis@sshhzlaw.com*
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 400-4990
Facsimile: (310) 399-7040

**LINDEMANN LAW FIRM, APC**
BLAKE J. LINDEMANN, SBN 255747
433 N. Camden Drive, 4th Floor
Beverly Hills, CA 90210
Telephone: (310) 279-5269
Facsimile:  (310) 300-0267
E-Mail:      blake@lawbl.com

**CUNEO GILBERT & LADUCA, LLP**
MICHAEL J. FLANNERY
500 North Broadway, Suite 1450
St. Louis, MO 63102
Telephone: (314) 226-1015
Fax:          (314) 789-1813
E-Mail:      mflannery@cuneolaw.com

***Co-Lead Class Counsel.***

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................. 2

    A.   The Complaint .......................................................................................... 2

    B.   Motions to Dismiss ................................................................................. 3

    C.   Discovery ................................................................................................. 3

    D.   Motions for Judgment on the Pleadings ................................................ 4

    E.   Class Certification and Ninth Circuit Appeal ...................................... 4

    F.   Motions for Summary Judgment ........................................................... 4

    G.   Motion for Ruling on Key Questions .................................................... 5

    H.   The Parties' Extensive Mediation Efforts ........................................... 6

    I.    Board Approval of the Settlements ....................................................... 7

    J.    Settlement Agreement Negotiations and Selection of Administrator ........ 7

    K.   Settlement Administration ..................................................................... 8

    L.    Highly Technical Nature of the Case .................................................... 9

III. ARGUMENT ..................................................................................................... 9

    A.   The Amount of Attorneys' Fees and Costs Sought is Reasonable. ........... 9

        1.   The Results Achieved for the Class Here Are Exceptional ............... 12

            a.   Participating Settlement Class Members Who Do Not Have
                Outstanding  Penalties Will Receive Cash Compensation ............. 13

            b.   Participating Settlement Class Members With Outstanding
                Penalties Will Get Penalty Forgiveness ........................................ 14

            c.   The Settlement Provides Valuable Programmatic and injunctive
                Relief ............................................................................................. 15

                TCA Remedial Measures ............................................................. 16

                i.   Increased Time to Pay Tolls ................................................. 16

                ii.   Removal of Opt-In Status ..................................................... 16

                iii.  Limit Transmissions of PII Going Forward .......................... 16

                iv.   Signage Enhancements ........................................................ 17

                OCTA Remedial Measures ......................................................... 17

PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS AND SERVICE AWARDS

# TABLE OF CONTENTS - CONT'D

         i.   Substantial Reduction of Maximum Penalties ...........................17

         ii.   Limit Transmissions of PII Going Forward ...............................18

    2.  The Requested Fee Is Reasonable Under the Percentage Method ......18

    3.  The Requested Fee Is Reasonable Under the Lodestar Approach.......20

         i.   The Number of Hours Claimed is Reasonable...........................20

         ii.   The Hourly Rates Are Reasonable ...........................................22

         iii.   A Positive Multiplier Is Justified .............................................22

    4.  The Requested Amount Is Comparable to Attorneys' Fees Awarded
      in Other  Cases ...................................................................................25

B.    Class Counsel's Expenses Are Reasonable ...............................................27

C.  The Requested Class Representatives' Service Awards Are

    Reasonable.................................................................................................28

IV.    CONCLUSION ...................................................................................................29

# TABLE OF AUTHORITIES

*Federal Cases*                      *Page(s)*

*Barbosa v. Cargill Meat Sols. Corp.*,
297 F.R.D. 431 (E.D. Cal. 2013) ........................................................ 24

*Bellinghausen v. Tractor Supply Co.*,
306 F.R.D. 245 (N.D. Cal. 2015) ................................................... 20, 28

*Bolton v. U.S. Nursing Corp.*,
2013 WL 5700403 (N.D. Cal. Oct. 18, 2013) ..................................... 19

*Brown v. Transurban, USA, Inc.*,
318 F.R.D. 560 (E.D. Va. 2016) ......................................................... 13

*Camacho v. Bridgeport Fin., Inc.*,
523 F.3d 973 (9th Cir. 2008) .............................................................. 21

*Cheng Jiangchen v. Rentech, Inc., No. CV 17-1490-GW*
(FFMX), 2019 WL 5173771 (C.D. Cal. Oct. 10, 2019) ...................... 20

*City of Riverside v. Rivera*,
477 U.S. 561 (1986) ............................................................................ 18

*Craft v. County of San Bernardino*,
624 F. Supp. 2d 1113 (C.D. Cal. 2008) .............................................. 22

*Cullen v. Whitman Med. Corp.*,
197 F.R.D. 136 (E.D. Pa. 2000) ......................................................... 11

*Davis v. City and County of San Francisco*,
976 F.2d 1536 (9th Cir. 1992) ............................................................ 25

*Farrar v. Hobby*,
506 U.S. 103 (1992) ............................................................................ 10

*Farrell v. Bank of Am, N.A., No. 18-56272*,
2020 WL 5230456 (9th Cir. Sept. 2, 2020) ........................................ 20

*Fleisher v. Phoenix Life Ins. Co., No. 11-CV-8405*
(CM), 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) ......................... 11

*Frank v. Gaos*,
139 S. Ct. 1041 (2019) ........................................................................ 13

PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS AND SERVICE AWARDS

# TABLE OF AUTHORITIES – CONT'D

_Federal Cases_ - Continued                                                      _Page(s)_

_Gaston v. Lexisnexis Risk Solutions, No. 5:16-cv-00009-KDB-DCK_,
   2021 U.S. Dist. LEXIS 97538 (W.D.N.C. May 24, 2021) ..................................... 28

_Harris v. Marhoefer_,
   24 F.3d 16 (9th Cir. 1994) ...................................................................... 27

_Hensley v. Eckerhart_,
   461 U.S. 424 (1983) ................................................................................ 10

_In re Anthem, Inc. Data Breach Litig., No. 15-MD-02617-LHK_,
   2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ......................................... 26

_In re Apple Inc. Device Performance Litig._,
   2021 WL 1022866 (N.D. Cal. Mar. 17, 2021) ......................................... 18

_In re Bluetooth Headset Prods. Liab. Litig._,
   654 F. 935 (9th Cir. 2011) ................................................................ _passim_

_In re Checking Account Overdraft Litig_,
   2013 U.S. Dist. LEXIS 190561 (S.D. Fla. Aug. 2, 2013) ...................................... 11

_In re Equifax Inc. Customer Data Sec. Breach Litig., No. 1:17-MD-2800-TWT_,
   2020 WL 256132 (N.D. Ga. Mar. 17, 2020) ......................................... 11-12

_In re Facebook Biometric Info. Privacy Litig._,
   522 F. Supp. 3d 617 (N.D. Cal. 2021) ................................................... 23, 26

_In re Google Referrer Header Privacy Litig._,
   869 F.3d 737 (9th Cir. 2017) .................................................................. 13

_In re HP Inkjet Printer Litig._,
   716 F.3d 1173 (9th Cir. 2013) .............................................................. 12

_In re Korean Air Lines Co., Ltd. Antitrust Litig., No. CV 07-05107 SJO AGRX_,
   2013 WL 27985376 (C.D. Cal. Dec. 23, 2013) .......................................... 10

_In re Lloyd's Am. Tr. Fund Litig., No. 96 Civ. 1262 RWS_,
   2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ...................................... 11

# TABLE OF AUTHORITIES – CONT'D

*Federal Cases* - Continued                                                                *Page(s)*

*In re Mercury Interactive Corp.*,
   618 F.3d 988 (9th Cir. 2010) ................................................. 10

*In re Nasdaq Mkt.-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ........................................... 22

*In re Nat'l Collegiate Athletic Ass'n Athletic Ass'n Athletic Grant-in Aid Cap Antitrust Litig.*, No. 4:14-MD-2541-CW,
   2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) ......................... 12

*In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD,
   2013 U.S. Dist. LEXIS 37286 (N.D. Cal. Mar. 18, 2013) ................. 26-27

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................... 23, 24, 25

*In re Optical Disk Drive Prod. Antitrust Litig.*,
   959 F.3d 922 (9th Cir. 2020) ........................................ 9-10

*In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No.: 1:
   14-md-02583-TWT, 2016 WL 11299474 (N.D. Ga. Aug. 23, 2016) .......... 26

*In re Vizio, Inc.*, No. 8:16-ml-02693-JLS-KES,
   2019 U.S. Dist. LEXIS 239976 (C.D. Cal. July 31, 2019) .............. 26

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
   19 F.3d at 1294 n.2 .......................................... 19, 25

*Kerr v. Screen Extras Guild, Inc.*,
   526 F.2d 67 .................................................... 25

*Krottner v. Starbucks Corp.*,
   406 F. App'x 129 (9th Cir. 2010) ........................... 24

*Leonard, et al. v. Baumer*
   (In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.), No.
   CV87-3962RN(GX), 1989 WL 73211 (C.D. Cal. Mar. 9, 1989) .......... 27

*Maley v. Del Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) ....................... 22-23

# TABLE OF AUTHORITIES – CONT'D

*Federal Cases* - Continued                                                                *Page(s)*

*Powers v. Eichen*,
    229 F.3d 1249 (9th Cir. 2000) ................................................................. 10

*Raffin v. Medicredit, Inc., No. CV 15-4912 MWF*
    (9JWx), 2018 U.S. Dist. LEXIS 232064 (C.D. Cal. Nov. 30, 2018) ..................... 26

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ................................................................. 28

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ........................................................... *passim*

*Thomas v. Dun & Bradstreet Credibility Corp., No. 15-03194 BRO* (GJSX),
    2017 U.S. Dist. LEXIS 235064 (C.D. Cal. Mar. 23, 2017) ........................... 23, 26

*Viceral v. Mistras Group, Inc., No. 15-cv-02198-EMC*,
    2017 WL 661352 (N.D. Cal. Feb. 17, 2017) ...................................... 27-28

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ......................................................... *passim*

*State Cases*

*In re Target Corp. Customer Data Sec. Breach Litig., No.* 14-md-02522,
    2015 WL 7253765 ........................................................................... 26

*Knight v. Red Door Salons, Inc., No. 08-0*
    1520 SC, 2009 ............................................................................. 25

*Wershba v. Apple Computer*,
    91 Cal. App. 4th 224 (2001) ........................................................... 22

*State Statutes*

Streets & Highways Code § 27565 ............................................................. 6

Streets & Highways Code § 31490 ...................................................... *passim*

# I.    INTRODUCTION

After more than six years of hard-fought litigation in the very first case brought under a complex privacy statute governing the toll roads' use of drivers' personally identifiable information ("PII") in California (*Streets & Highways Code § 31490* ("31490")), Class Counsel negotiated a substantial monetary settlement of $216,950,000 ($41,950,000 in non-reversionary cash and $175,000,000 forgiveness of Class member penalties), as well as programmatic and injunctive relief on behalf of approximately 15 million class members. In spite of facing a vigorous defense from five Defendants, each represented by their own counsel, Class Counsel successfully certified a class, defended a petition to appeal that class certification to the Ninth Circuit, litigated and prevailed over numerous dispositive motions (motions to dismiss, for judgment on the pleadings and for summary judgment), and conducted an extensive and comprehensive discovery program that pushed the case to the brink of trial. It would be no understatement to say that Class Counsel achieved an exceptional settlement for the Class, particularly given the risks faced. To achieve this result, Class Counsel risked thousands of hours of work and over half a million dollars in out-of-pocket expenses on a novel liability theory, reaching this resolution only a few months away from trial. Class Counsel therefore seek final approval of $20,737,500 for attorneys' fees and $571,972.15 in litigation costs.

Class Counsel also request that the Court award service awards to the Class Representatives in the amount of $3,000 to $15,000[2] per settlement for a total of $125,000 in light of their significant contributions to the case, the invasions into their personal affairs and the personal risks they faced, in accordance with the terms of the preliminarily approved Settlements[3] between Plaintiffs and Defendants. Throughout the Action, these Class Representatives did everything in their power to represent the best

---

[2] See footnote 1 for the breakdown of Service Awards requested Per Class Representative
[3] Except as otherwise specified, capitalized words and terms herein have the same meaning ascribed to them in the Settlement Agreements, Dkts.585-4, 585-5, 594-3.

interests of the Class.  No settlement or recovery would have been possible without their vital roles.

As of the date of this filing, 1,292,063 claims have been submitted.  Additionally, Penalty Forgiveness Class members will automatically receive penalty forgiveness – no claim form is required for these class members.

The benchmark attorneys' fee award in the Ninth Circuit is 25% of a common fund, but Class Counsel's request is substantially lower than the benchmark.  The requested attorneys' fee award amounts to only 9.6% of the Settlement values (not counting the value of any injunctive relief) and constitutes a very small multiplier of 1.067 on the collective lodestar of $19,437,708.25 expended by the firms that contributed to the success of this litigation.  The requested fees are fair and reasonable in light of the significant risks Class Counsel and other Plaintiffs' Counsel faced and based upon the excellent results achieved.  The requested award would fairly compensate Class Counsel for the exceptional result they achieved for the Class without providing a windfall. All applicable factors support the requested award.

Plaintiffs and Class Counsel respectfully request that the Court grant this Motion in its entirety.

## II.    BACKGROUND

Prosecuting this case to a successful result required substantial commitments of time and resources from Class Counsel and other Plaintiffs' Counsel.

### A.    The Complaint

This action was initially filed in the Orange County Superior Court on or about October 2, 2015, based on a government claim act letter served on February 26, 2015, and later removed to federal court on February 16, 2016. Two additional federal actions were filed and eventually consolidated into the current litigation in the spring of 2016. The case was litigated intensely over the past five years, with multiple motions to dismiss, multiple motions for summary judgment and a motion for class certification

(and a petition to appeal that ruling to the Ninth Circuit), motions for reconsideration, multiple hearings, and extensive discovery relating to Plaintiffs' claims. *See generally* Declaration of Helen Zeldes, filed concurrently herewith.

Plaintiffs' Complaint brought a claim under *Streets and Highways Code § 31490*[4] (the only cause of action to which class certification was granted) which alleged that Defendants improperly provided PII of users and subscribers of the Toll Roads (including Plaintiffs) to dozens of third parties in violation of § 31490(a), subjecting them to statutory damages of $2,500 per violation under § 31490(q). Plaintiffs also alleged that Defendants violated other laws and statutes, including an excessive fines claim (stemming from penalties they imposed), a due process claim (stemming from their violation notices, administrative review procedures and lack of signage) as well as several other claims. This action is the first case that has ever been filed concerning a violation of *Streets and Highways Code § 31490* and presented numerous legal and factual issues of first impression.

**B.    Motions to Dismiss**

The TCA and OCTA filed Motions to Dismiss that were granted in part and denied in part on December 20, 2016, through which nearly all Plaintiffs' claims were dismissed with leave to amend. Plaintiffs amended the operative Complaint on January 19, 2017, and Defendants TCA and 3M answered that Complaint on February 14, 2017. OCTA answered on February 15, 2017, and Cofiroute answered on March 6, 2017.

**C.    Discovery**

Discovery efforts in the litigation were intense, wide-ranging and extensive, on both sides, and the Parties engaged in constant meet and confer efforts regarding numerous complex discovery issues, with motion practice requiring the Court's intervention on multiple occasions, as well as resolving many issues outside of

---

[4] This statute was enacted on September 29, 2010, SB1268.

Court.   Plaintiffs undertook comprehensive and ambitious discovery into all five Defendants' conduct, including the production of and review of over 500,000 pages of documents, depositions of 34 witnesses, expert discovery, a site inspection of TCA's VTX System and a site inspection of the computerized database and software system maintained by Cofiroute on behalf of OCTA. *See* Zeldes Decl. at ¶ 6.  Discovery took place over the course of 40 months, with multiple motions filed and fully litigated during that time.  *Id*. Third party subpoenas were issued to 15 parties, and depositions of those third parties were also undertaken.  *Id*.

### D.   Motions for Judgment on the Pleadings

Defendants filed Motions for Judgment on the Pleadings on March 24, 2017. After extensive briefing and oral argument, the Court granted in part and denied in part each motion on August 2, 2017. Dkt. 204. The Court dismissed Plaintiffs' Rosenthal Act claim and also dismissed Plaintiffs' claims against 3M for damages under the California Constitution. The parties continued with discovery on Plaintiffs' § 31490, negligence, constitutional privacy, due process and excessive fines claims.

### E.   Class Certification and Ninth Circuit Appeal

Plaintiffs' Motion for Class Certification was filed on April 27, 2018, and fully briefed over the course of the next two months, leading to a full class certification hearing on July 31, 2018.  *Id*. at ¶ 9.  The Court certified Plaintiffs' proposed Privacy Class and amended the class definition a few months later but declined to certify any other claims. Dkt Nos. 439, 501. Defendants 3M and TCA filed motions for reconsideration. 3M then filed a petition seeking permission to appeal to the Ninth Circuit under Rule 23(f), which was also denied in April of 2019.

### F.   Motions for Summary Judgment

All five Defendants sought summary judgment on multiple occasions, requiring extensive briefing each time, and some Defendants sought reconsideration after the Court ruled.  Zeldes Decl. at ¶ 12. Motions for partial summary judgment were first filed

in March of 2017, but later withdrawn, only to be renewed in September of 2017. Among other things, at issue in the summary judgment motions were Plaintiffs' claims under § 31490, which, over time, became the focus of the litigation.

On January 12, 2018, the Court granted summary judgment on the portion of Plaintiffs' claim based on alleged violations of the privacy policy but denied the motion without prejudice as to the rest of Plaintiffs' claim for improper sharing of PII. Dkt. 297. Discovery continued on the remainder of Plaintiffs' claims.

Defendants' third set of motions for summary judgment were filed on June 17 and 18, 2018. On July 31, 2018, Plaintiffs' CLRA, UCL, and constitutional claims and request for injunctive relief against 3M were dismissed. Dkt. 440. The excessive fines claim against TCA was dismissed, but the individual due process claim survived. Almost immediately after the Court ruled on the summary judgment motions, Defendants 3M and TCA filed extensive motions for reconsideration. The Court's tentative ruling denied those motions and, after argument on those motions in late September of 2018, the motions were taken under submission. Before oral argument was held on OCTA and Cofiroute's motions, the case was stayed to allow Defendants' Ninth Circuit petition for an appeal of the class certification to be decided and the parties to pursue possible settlement through mediation.

### G. Motion for Ruling on Key Questions

Over the course of the litigation, Defendants suggested to the Court that, with respect to certain issues in the case, concerning elements of the § 31490 claim, resolution of particular "key questions" would help to resolve the matter. Defendants ultimately filed their motion on June 10, 2019, and the parties briefed the motion, but the Court withheld its ruling on the matter for several months, which provided an impetus for settlement negotiations, leading ultimately to the 3M settlement in July 2019, followed by the TCA settlement in August 2019.

On January 17, 2020, the Court issued its ruling on Defendants' Key Questions Motion. In its ruling, the Court found that certain types of transmissions for interoperability and/or collection and enforcement did not violate Section 31490. [Dkt. No. 566] With respect to intrastate interoperability, the Court found that Section 31490 permits Defendants to send information to another transportation agency for interoperability under subsection (a) of section 27565 of the Streets and Highways Code, including, but not limited to, the date and time, toll plaza, and lane of that other agency's accountholder's use of its toll road.  The Court additionally found that certain other transmissions for collection and enforcement purposes did not violate Section 31490, such as transmissions of information to the DMV or vendors to identify the registered owner and address or to car rental companies. The Court found that providing information to a third-party collection agency to collect unpaid delinquent tolls and penalties was permitted by Section 31490 but insufficient information had been presented to show whether or not the information provided was required for enforcement and collection purposes.  With respect to certain other transmissions, the Court found that it was unable to make a ruling due to unresolved factual issues.

## H.   The Parties' Extensive Mediation Efforts

The parties engaged in *five* mediations over the course of this litigation before the case was able to be fully resolved as to all Defendants.  The first mediation occurred in January 2017 with all parties participating in a mediation before Lynn Frank.  Despite a full day of negotiations, the mediation was unsuccessful.

On February 25, 2019, Plaintiffs and all defendants participated in a mediation with Robert Kaplan. Hard fought, intensive and arms'-length negotiations over the course of a full day did not result in a settlement.

On April 25, 2019, Plaintiffs and 3M participated in a second mediation with Mr. Kaplan. The parties made progress toward a resolution and agreed to continue settlement discussions with the assistance of Mr. Kaplan. Over the course of the next three months,

involving multiple arms'-length communications and further negotiations between and among the parties and Mr. Kaplan, the parties reached a settlement in principle on July 16, 2019.  *See* Zeldes Decl. at ¶ 14.

On August 21, 2019, Plaintiffs and the TCA Defendants participated in a mediation with Rachel Ehrlich, which lasted for 19 hours, concluding at 4:30 a.m. in the morning of August 22.  *Id*. at ¶ 15. The mediation resulted in a settlement in principle with the signing of a term sheet. Over the course of the next several months, Plaintiffs and the TCA Defendants spent considerable time with the assistance of Ms. Ehrlich working out the details of the Settlement Agreement. *Id.*

The Court's January 17, 2020, Order on Key Questions paved the way for Plaintiffs and the OCTA Defendants to resolve their remaining issues.  Plaintiffs and the OCTA Defendants participated in a final mediation with Mr. Kaplan on March 2, 2020. The parties made significant progress toward a resolution, including a conceptual agreement on many of the basic terms of a settlement. Mr. Kaplan submitted a Mediator's Proposal, which was accepted by all of the Parties subject to approval of the OCTA Board of Directors.  The Classes are now on track to achieve unprecedented settlements.

## I.    Board Approval of the Settlements

The TCA and OCTA settlements were subject to the approval of the boards that oversee their operations and were put to a vote of the respective agencies' boards following the conclusion of the mediation efforts described above.  The TCA and the OCTA settlements were approved by their respective boards.

## J.    Settlement Agreement Negotiations and Selection of Administrator

While a settlement in principle was reached on July 16, 2019 with Defendant 3M, on August 22, 2019 with Defendant TCA, and on March 13, 2020 with Defendant OCTA, it took the parties months of arduous negotiations over the terms of the Settlement Agreements.  Zeldes Decl. ¶ 17.  These efforts, like literally every aspect of

this litigation, were arms-length and hard fought. As the Special Master noted regarding the Ruling on Key Questions, "The Court had long proposed to make such rulings to facilitate the advancement of the case, and they ultimately affected numerous aspects of it. At the hearing, Plaintiffs' counsel agreed that the proceedings related to the Key Legal Questions Order, including the Court's agreement to hold the order while the parties negotiated potential settlements, were critical in the parties' ability to resolve the case. For these reasons, the Special Master is more than satisfied that these settlements represent a non-collusive compromise between the parties' strongly held and disputed positions." Dkt. 585, 594.

Class Counsel also spent significant time obtaining bids from and negotiating with six third-party administrators in order to get the best deal for the Class. After soliciting and reviewing competing bids for administration of the Settlement, the Parties agreed that due to its extensive experience in large complex notice programs and its involvement with the class certification notice in the case, Epiq was best suited to handle this complex notice and administration program.  The notice costs to approximately 15 million class members, for all three settlements, totaled approximately $3,150,000.[5] These figures include all costs associated with class member data management, legal notification, telephone support, claims administration, postage, and disbursements and tax reporting.  Class Counsel also worked closely with Epiq to hone the notices and claim forms to comply with applicable law. Zeldes Decl. ¶ 19.

Finally, Class Counsel prepared and filed the three Settlement agreements along with the Motions for Preliminary Approval (Dkts. 585-4, 585-5, 594-3), which the Court granted on May 17th, 2021. (Dkts. 599, 600).

### K.   Settlement Administration

Since the Preliminary Approval Order, Class Counsel have worked alongside

---

[5] The 3M/TCA notice program estimate is $2.7M; The OCTA notice program estimate is $450k.

Epiq to ensure the notice and claims process proceeds smoothly for the Class Members. Class Counsel repeatedly audited the website to make sure it was correct and user friendly, reviewed weekly reports from, and conferred with Epiq about the progress of the claims process, and responded to inquiries from Class Members that came into their respective offices. Zeldes Decl. ¶ 19.

Class Counsel will continue to expend significant efforts to communicate with Class Members, seek final approval of the Settlement, and respond to any criticism that may be filed, including potential appeals. The lodestar presented to the Court in this Motion does not include the significant time that will continue to be expended on such efforts. Zeldes Decl. ¶ 20.

### L. Highly Technical Nature of the Case

The highly technical nature of this case also required significant work by experts, whose fees Class Counsel advanced. Due to the sensitive and highly technical nature of the government entities' computer systems, Class Counsel and their affirmative experts, spent several weeks reviewing voluminous reports, queries, data, computer systems and programs, to allow Plaintiffs to tender evidence of Defendants' PII sharing practices. Understanding and distilling this information proved crucial to Plaintiffs' case, because the Defendants had not disclosed their PII sharing practices with third parties.

## III. ARGUMENT

### A. The Amount of Attorneys' Fees and Costs Sought is Reasonable.

District courts may award attorneys' fees and costs to a prevailing plaintiff where "the successful litigants have created a common fund for recovery or extended substantial benefit to the class." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F. 935, 941 (9th Cir. 2011) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 275 (1975)). In evaluating theses requests, the Court "assume[s] a fiduciary role that requires close scrutiny of class counsel's requests for fees and expenses from the common fund." *In re Optical Disk Drive Prod. Antitrust Litig.*, 959 F.3d 922, 930 (9th

Cir. 2020).   A close look at the fee request demonstrates that the requested fee is reasonable given the outstanding result and the high degree of risk faced by counsel. Similarly, Class Counsel's expenses were necessary to prosecute this action, and the service awards properly compensate the Class Representatives for their roles in reaching these Settlements.

Where counsel for a class seek fees from a common fund, courts within the Ninth Circuit have discretion to employ either the percentage-of-fund or the lodestar multiplier method to determine whether the fee request is reasonable. *See In re Mercury Interactive Corp.*, 618 F.3d 988, 992 (9th Cir. 2010); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-49 (9th Cir. 2002); *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000). Regardless of the chosen method, courts must award attorneys' fees based on an evaluation of "all of the circumstances of the case." *Vizcaino* at 1048.

The percentage method is preferred in cases where there is a cash-based common fund, and the Court should therefore use that method here.   *In re Korean Air Lines Co., Ltd. Antitrust Litig.*, No. CV 07-05107 SJO AGRX, 2013 WL 27985376, at *1 (C.D. Cal. Dec. 23, 2013).   When courts consider requests for attorneys' fees based on the percentage method, they consider "(1) the extent to which class counsel achieved exceptional results for the class; (2) whether the case was risky for class counsel; (3) whether counsel's performance generated benefits beyond the cash settlement fund; (4) the market rate for the particular field of law; (5) the burdens class counsel experienced while litigating the case, (6) and whether the case was handled on a contingency basis." *Optical Disk Drive*, 959 F.3d at 930. It is undisputable that the result achieved here – a close to $217-million dollar recovery – is exceptional.   The risks and burdens for Class Counsel were tremendous, as evidenced by the amount of years this case has been pending, the amount of out-of-pocket expenses counsel advanced for the Class (over half a million dollars), the amount of time this hotly litigated matter took away from other litigation, and working without guarantee of payment for many years.   The result

Counsel achieved here goes beyond the cash value of the Settlement and benefits the Class and the public with substantive programmatic changes to Defendants' practices. Class Counsel's requested fees and rates are comparable to their colleagues in consumer class actions handled as this action was, on a contingency fee basis. Whether applying the lodestar or percentage method, "the most critical factor is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)(superceded on other grounds); *Farrar v. Hobby,* 506 U.S. 103, 103 (1992) ("The most critical factor in determining a fee award's reasonableness is the degree of success obtained"); *see also In re Bluetooth*, 654 F.3d at 942 ("Foremost among these considerations . . . is the benefit obtained for the class."); Federal Judicial Center, *Manual for Complex Litigation*, § 27.71, 336 (4th ed. 2004) (the "fundamental focus is on the result actually achieved for class members").   The relief achieved here for 15 million class members is a huge success that goes to the heart of the claims brought.

Here, Class Counsel request that the Court apply the percent-of-fund method and award attorneys' fees of $20,737,500[6], representing 9.6% of the approximately $217 million monetary settlement value.[7]   The fund here is fairly calculated based on the non-cash components of the settlement, and specifically here, debt forgiveness. *See, e.g., In re Lloyd's Am. Tr. Fund Litig.*, No. 96 Civ. 1262 RWS, 2002 WL 31663577, at *8 (S.D.N.Y. Nov. 26, 2002) (approving approximately 28% of the total settlement value,

---

[6] Plaintiffs are seeking $2,987,500 from the 3M Settlement, $17,500,000 from the TCA Settlement, and $250,000 from the OCTA Settlement.

[7] Notably, the $217 million settlement value is quite conservative as it does not include value for the practice changes. *See, e.g., In re Checking Account Overdraft Litig*, 2013 U.S. Dist. LEXIS 190561(S.D. Fla. Aug. 2, 2013) (approving award of 30% of $23,200,000 total settlement value, which included $18,300,000 in cash and practice changes with estimated value of $4,900,000); *Lopez v. JPMorgan Chase*, No. 1:09-MD-02036-JLK (S.D. Fla. Dec. 19, 2012) (approving award of 30% of $162 million total settlement value, consisting of $110 million cash and overdraft fee policy change with estimated value of $52 million); *Fleisher v. Phoenix Life Ins. Co.*, No. 11-CV-8405 (CM), 2015 WL 10847814, at *15 (S.D.N.Y. Sept. 9, 2015) (evaluating fee request based on "total gross value of the settlement," which included "$40.5 million in cash" plus practice changes worth "an additional $94.3 million in [non-monetary] value to the Class").

which included $8,500,000 in cash and "$11,500,000 in Credit Notes to be used by Class Members to reduce debt they owed or were claimed to owe"); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 46-47 (E.D. Pa. 2000) (approving fee of one third of the total settlement value, plus one third of the interest accrued on the fund, where total settlement value included $5.97 million in cash and $1.3 million in loan forgiveness). In *Equifax*, the fee was approximately 20.36% of the fund, even though much of the fund would provide only credit monitoring, and the remainder included many internal caps on cash compensation. *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *36 (N.D. Ga. Mar. 17, 2020).

Here, all Settlement Class members suffered the same type of monetary injuries, which both the Settlements' cash and debt relief portions address.

As discussed below, the amount of attorneys' fees sought is also justified under a lodestar-multiplier crosscheck analysis, as it represents a modest 1.067 multiplier to Class Counsel's $19,437,708.25 lodestar, which was reasonably expended.

### 1. The Results Achieved for the Class Here Are Exceptional

When considering the amount of attorneys' fees in a class action, "[t]he most important factor is the results achieved for the class." *In re Nat'l Collegiate Athletic Ass'n Athletic Ass'n Athletic Grant-in Aid Cap Antitrust Litig.*, No. 4:14-MD-2541-CW, 2017 WL 6040065, at *3 (N.D. Cal. Dec. 6, 2017), *aff'd* 768 F. App'x 651 (9th Cir. 2019). "Typically, courts try to ensure faithful representation by tying together the interests of class members and class counsel. That is, courts aim to tether the value of an attorneys' fees award to the value of the class recovery." *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013).

Here, the result is unprecedented, both on its own and in comparison to other settlements involving data breach and privacy issues. Class Counsel's efforts generated exceptional Settlements that include $41.95 million non-reversionary Settlement Funds, $175 million in penalty forgiveness, and injunctive/programmatic relief. The $41.95

million non-reversionary settlement funds will be distributed as Cash Awards to those who qualify under the terms of the Settlements. The Settlement Funds will also be used to pay for any Service Awards to the Class Representatives, attorneys' fees and costs awarded by the Court, Special Master Fees and Notice and Administration Expenses. The $175 million in penalty forgiveness will be distributed *automatically* to eligible settlement class members, no claim form is required.  The significant programmatic and injunctive relief are not included in the calculation of the settlement value but clearly provide substantial valuable relief to class members as well. For example, among other things, the TCA has agreed to expand the amount before issuing a Notice of Toll Evasion from 5 to 7 days, has changed its privacy policy to more fully reflect what they do with class members' PII, and reset the opt-in status for subscribers.  The OCTA has agreed to reduce its maximum penalty in almost half from $195 to $100 and limiting the amount of PII it sends to third-party debt collectors.

To be clear, the relief obtained here is significant, particularly as it compares to other cases of this type. In *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 740 (9th Cir. 2017), vacated on other grounds by *Frank v. Gaos*, 139 S. Ct. 1041 (2019), the Ninth Circuit affirmed a 25% award of attorneys' fees in a case where all of the money was to go to *cy pres*, with no cash relief for the class at all. *Gaos*, 139 S. Ct. at 1045. *See also Brown v. Transurban, USA, Inc.*, 318 F.R.D. 560, 569-70 (E.D. Va. 2016).

### a.  Participating Settlement Class Members Who Do Not Have Outstanding Penalties Will Receive Cash Compensation

TCA Settlement Class Members will get a pro rata share of $29 million dollars. 3M Settlement Class Members will get a pro rata share of $11.95 million dollars. OCTA Settlement Class Members will get a pro rata share of $1 million dollars.

Settlement Class Members can submit a claim to receive a cash payment whether or not they have supporting documentation.  Over four million Class Members received

claims forms pre-populated with unique identification numbers – all they need to do to submit a claim is sign and mail in the pre-populated claim form or submit their claim on the settlement website.  Over ten million Class Members received email notification of the settlements with pre-populated unique identification numbers – they can submit a claim form directly from their email by clicking on a link embedded in the email.  Some 14,701,620 class notices were sent directly to Class Members.  Class Members who do not have a unique ID may submit a claim with or without supporting documents and receive a half share of the pro rata amount by declaring under penalty of perjury they drove on the toll roads during the class period or they may submit additional information such as their transponder ID number to be eligible to get a full pro rata share of the relevant settlement.

Over 1.2 million people have already filed claims, and there are still two weeks left in the claims period.  Zeldes Decl. ¶ 24.[8]  There have been no objections filed to date.  This overwhelmingly positive response not only demonstrates how successful the notice plan has been, but also is evidence that the Class believes the Settlement to be a strong one.

### b. Participating Settlement Class Members With Outstanding Penalties Will Get Penalty Forgiveness

For the TCA Settlement, the Penalty Forgiveness amount will be distributed in two steps: First, all Participating Penalty Forgiveness Class Members will receive the lesser of the total of their outstanding penalties or $57.50 (the equivalent of at least one penalty assessment) in penalty forgiveness. Second, the remainder of the Penalty Forgiveness Fund will be distributed to Penalty Forgiveness Class Members from those with the oldest outstanding penalties to the newest. There is no requirement to

---

[8] These numbers do not account for the large amount of class members who are eligible for penalty forgiveness and were not required to submit claims to participate.

submit a Claim Form to receive penalty forgiveness; it will be electronically pushed out to Penalty Forgiveness Class Members.

For the OCTA Settlement, the Penalty Forgiveness amount will be distributed in two steps: First, all penalties owed as of the Settlement Class Period End Date by Penalty Forgiveness Eligible Class Members will be reduced to $100.00 per violation (from a current maximum of between $150 and $190). Second, the remainder of the $40 million penalty forgiveness fund will be allocated on a per capita basis to all Penalty Forgiveness Eligible Class Members and applied to the remaining balance of their outstanding penalties.

This is critical relief to Class Members who have not been able to get out from underneath penalties that have been assessed against them, have collection efforts continuing against them, or are facing FTB levies, DMV holds and/or other collection efforts. Defendants have not written off these debts and have ongoing collection efforts related to these penalties. Notably, Settlement Class Members who are eligible for this relief do not have to submit a claim form, as their penalty forgiveness will be provided automatically based on what Defendants' records show regarding penalties that are outstanding.

### c. The Settlement Provides Valuable Programmatic and Injunctive Relief

"Incidental or non-monetary benefits conferred by the litigation are relevant circumstances" in determining an appropriate award of attorneys' fees, under both the lodestar and percentage methods. *Vizcaino*, 290 F.3d at 1049 (concluding that change in employer practices and clarification of law were factors supporting fee award) (citing with approval *Bebchick v. Wash. Metro. Area Transit Comm'n*, 805 F.2d 396, 408 (D.C. Cir. 1986) ("[A]n upward adjustment to the lodestar is appropriate to reflect the benefits to the public flowing from this litigation.")); *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003) ("[C]ourts should consider the value of the injunctive relief obtained as

a 'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees.").

The Settlements confer valuable remedial measures that Defendants have undertaken, and will continue to implement, as a result of this litigation and the Settlements. Dkts. 585-5, 594-3. These remedial measures include:

### TCA Remedial Measures

### i. Increased Time to Pay Tolls

The TCA has agreed to increase the time that drivers have to pay their tolls before a Notice of Toll Evasion is issued from 5 days to 7 days (a 40% increase in the grace period). The TCA has also agreed to change their privacy policy to include a list of the categories of PII sent to any third party, including but not limited to entities that belong to the California Toll Operators Committee ("CTOC"), and a separate list of the categories of PII the TCA receives from other Toll Agencies. Dkts. 594-3.

### ii. Removal of Opt-In Status

The TCA will remove the opt-in status all for all current subscribers in the VTX system (governing opt-ins for communications by TCA) if the Court approves that they can send (i) a single email to all account holders notifying them that they have been opted out and asking them to select their communications preferences in their online account; and (ii) a statement to be included in any other communications that would otherwise be sent to TCA customers advising them to update their communications preferences and/or containing a link to a website that allows TCA customers to update their communications preferences. *Id.*

### iii. Limit Transmissions of PII Going Forward

The TCA has agreed on a going forward basis to the following limitations on its PII transmissions:

1. When the TCA sends PII to the Franchise Tax Board ("FTB") for the purpose of placing a tax intercept, the TCA will send only the PII that the FTB requires to place

such tax intercept. When the TCA transmits PII to a rental car company as a result of a rental car traveling on State Routes 73, 133, 241, or 261 and failing to pay a toll associated with travel on such Route, the TCA will transmit only such PII as is contained in the toll violation notice resulting from the aforementioned failure to pay a toll. *Id.*

2. The TCA shall use skip tracers only in instances where: (i) mail is returned to the TCA as undeliverable, or (ii) the TCA requires the use of skip tracers to obtain information that the FTB requires to place a tax intercept. Notwithstanding the foregoing, if legislation is enacted that provides for the use of skip tracers in additional instances, the TCA shall also be permitted to use skip tracers in those additional instances. *Id.*

3. When the TCA sends PII to the California Department of Motor Vehicles for the purpose of causing the DMV to place a DMV registration hold, the TCA shall only send the PII that the DMV requires to place a DMV registration hold. *Id.*

### iv. Signage Enhancements

Since the filing of this lawsuit, the TCA has undertaken significant signage enhancement projects, including, in the spring of 2019, sign enhancements along the 73, 133, 241, and 261 and, in 2020, updating and modifying nearly 600 roadway signs on the 73, 133, 241, and 261 Toll Roads, including connecting highways and arterials. The TCA has also provided significant revisions and improvements to its privacy policy to now disclose its current collection and sharing PII practices. *See* https://thetollroads.com/sites/default/files/Privacy_Policy_01_01_2020.pdf (last visited October 28, 2020).

### OCTA Remedial Measures

#### i.  Substantial Reduction of Maximum Penalties

In addition to the cash and penalty forgiveness, as additional benefits of the settlement, OCTA will reduce the maximum per-violation penalty to $100.00 from a

maximum penalty of 20x the highest system wide toll. The highest the toll penalty has been during the class period is $195.00.

### ii. Limit Transmissions of PII Going Forward

In addition, absent a change in existing California law regarding the PII that can be provided to a third-party debt collector, and without conceding that a unique violator ID number assigned to each toll violator is PII, the Parties have agreed that the only PII of toll violators that Settling Defendants will provide to a subcontracted third-party debt collector will be the information contained in the relevant toll violation notice(s), together with any updated contact, address and/or email information, and a unique toll violator identification number assigned by Cofiroute.  Dkt. 594-3.

Because the remedial measures increase the time for the public to pay their tolls, increase the transparency about who drivers' PII is being shared with, and reduces the penalties (on the OCTA toll road) — these remedial measures provide an enormous benefit to *all* Class Members, regardless of whether they submit a claim for other benefits. *Id*.[9]  While these remedial measures provide valuable relief, Plaintiffs have not put a financial value on them and do not include them in the valuation of the common fund.

### 2. The Requested Fee Is Reasonable Under the Percentage Method

"The use of the percentage-of-the-fund method in common fund cases is the prevailing practice in the Ninth Circuit for awarding attorneys' fees and permits the Court to focus on showing that a fund conferring benefits on a class was created through the efforts of plaintiffs' counsel." *In re Apple Inc. Device Performance Litig.*, 2021 WL 1022866, at *2 (N.D. Cal. Mar. 17, 2021) (alteration and quotation omitted). The method

---

[9] In addition, the remedial measures attributable to the Settlement extend to non-Class Members who may utilize Defendants' toll roads in the future, because they too will receive the benefits flowing from Defendants programmatic changes. *See City of Riverside v. Rivera*, 477 U.S. 561 (1986) (courts may consider the public benefits of counsel's efforts in determining reasonable attorneys' fees); Vizcaino, 290 F.3d at 1049 (considering the benefits to non-class members).

"confers 'significant benefits . . . including consistency with contingency fee calculations in the private market, aligning the lawyers' interest with achieving the highest award for the class members, and reducing the burden on the courts that a complex lodestar calculation requires.'" *Id.* (quoting *Tait v. BSH Home Appliances Corp.*, 2015 WL 4537463, at *11 (C.D. Cal. July 27, 2015)). By contrast, "[i]n a common fund case, a lodestar method does not necessarily achieve the stated purposes of proportionality, predictability and protection of the class," *Bolton v. U.S. Nursing Corp.*, 2013 WL 5700403, at *5 (N.D. Cal. Oct. 18, 2013).

Under the percentage method, the district court may award plaintiffs' attorneys a percentage of the common fund, so long as that percentage represents a reasonable fee. *See, e.g.*, *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d at 1294 n.2. Although the Ninth Circuit has set 25% of a common fund as a "benchmark" award under the percentage-of-the-fund method, courts award more than the benchmark when justified, considering factors much like those considered when determining whether a multiplier is appropriate under the lodestar approach. *Vizcaino*, 290 F.3d at 1048, 1051.

The analysis begins by determining the size of the fund, and the Court has discretion to determine what portion of the common fund is "for the benefit of the entire class." *In re Bluetooth*, 654 F.3d at 942. As explained above, at minimum the common fund includes all monetary benefits of the Settlements and therefore the Settlements are properly valued in excess of $216 million and the requested fee award of $20,737,500 coming out of such common fund represents some **9.6%** of that amount. *See supra*, Section III.A. Accordingly, the requested fee here is well below the Ninth Circuit's 25% "benchmark" for such awards. *Vizcaino*, 290 F.3d at 1047.

As explained above and in the supporting declarations of Class Counsel, the extraordinary result presented by the Settlements, the contingent nature of representation, the risks of nonpayment, the highly complex nature of the litigation, and

PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS AND SERVICE AWARDS

the high caliber of lawyering required and employed by all counsel weigh in favor of a higher percentage of the fund than that sought by Class Counsel here.

### 3.  The Requested Fee Is Reasonable Under the Lodestar Approach

Preliminarily, no lodestar cross check is required as there is no windfall to Class Counsel since this action has been heavily litigated since 2015.  One of the ways that the Ninth Circuit has suggested—although it has expressly declined to require—assessing fees, is to conduct a lodestar crosscheck. That is, to consider the hours that class counsel spent on the litigation and compare them to the percentage fee award to determine its reasonableness. It is "settled" law in the Ninth Circuit that lodestar crosscheck is not required. *Farrell v. Bank of Am, N.A.*, No. 18-56272, 2020 WL 5230456, at *2 (9th Cir. Sept. 2, 2020) (*citing Campbell v. Facebook*, Inc., 951 F.3d 1106, 1126 (9th Cir. 2020)). Rather, a district court can determine that the circumstances of a given case warrant a certain percentage of a fund—particularly if that percentage is under the 25% benchmark—without considering class counsel's lodestar. *See id.*

Even application of the lodestar method here confirms the propriety of Class Counsel's fee request. Under this approach, the lodestar figure is determined by multiplying the number of hours reasonably expended on the litigation by hourly rates. *In re Bluetooth*, 654 F.3d at 941. The lodestar figure, however, is only the starting point for determining an appropriate fee. *Id.*

### i.      The Number of Hours Claimed Are Reasonable

When a court decides to conduct a lodestar crosscheck, the "calculation need entail neither mathematical precision nor bean counting." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 264 (N.D. Cal. 2015). "Under the lodestar method, courts 'calculate the fee award by multiplying the number of hours reasonably spent by a reasonable hourly rate and then enhancing that figure, if necessary, to account for the risks associated with the representation.'" *Cheng Jiangchen v. Rentech, Inc.*, No. CV

17-1490-GW(FFMX), 2019 WL 5173771, at \*10 (C.D. Cal. Oct. 10, 2019) (*quoting Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)).

Plaintiffs' Counsel maintained contemporaneous, detailed time records. The hours expended by each Plaintiffs' Counsel firm included in the present request are detailed in the accompanying Declarations of Co-Lead Class Counsel. (Zeldes Decl. ¶ 38, Flannery Decl. ¶ 5, Lindemann Decl. ¶ 6.)

As detailed above and in the declarations, these hours include: (1) engaging in extensive coordination efforts, (2) vetting potential class representatives, (3) extensively researching and filing the Complaint, (4) opposing over nineteen dispositive motions filed by the five Defendants', including numerous motions to dismiss, motions to strike, motions for judgement on the pleadings, motions for summary judgment (5) meeting and conferring regarding discovery disputes with defense counsel and negotiating agreements regarding discovery (6) litigating before the Court several issues pertaining to the scope of discovery, (6) reviewing Defendant's production of over 500,000 pages of documents and taking 34 depositions of key Defense witnesses, (7) coordinating with Plaintiffs and producing their documents along with discovery responses, (8) undertaking substantial investigation of the claims in this case and consulting with several experts, (9) researching, drafting and arguing a motion for class certification, (10) actively participating in five private mediation sessions, (11) negotiating the details of the Settlement Agreements over multiple months and drafting and arguing the preliminary approval motions, and (12) responding to inquiries from Class Members after Class Notice was disseminated. Zeldes Decl. ¶ 42.

Moreover, additional work will be required. Class Counsel must still: (1) prepare for and attend the final approval hearing, including the research and drafting of the final approval papers and responses to objections; (2) continue to respond to the many inquiries from Class Members; (3) oversee the Settlement through final approval of distribution of the common fund; (4) oversee the claims administration process,

including addressing any claim review issues; and (5) handle any appeals. Zeldes Decl. ¶ 43.

### ii.     The Hourly Rates Are Reasonable

Plaintiffs' Counsel are entitled to the hourly rates charged by attorneys of comparable experience, reputation, and ability for similar complex federal litigation. *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). Here, Plaintiffs' Counsel's hourly rates are reasonable in light of their significant experience, expertise, and skill. (Zeldes Decl. ¶ 45; Flannery Decl. ¶ 4, Lindemann Decl. ¶ 6).

Class Counsel have brought to this case extensive experience in the areas of consumer class actions and complex litigation. *See* Zeldes Decl., Ex. 3; Flannery Decl. Ex. 3; Lindemann Decl., Ex. 3.  The hourly rates of Plaintiffs' Counsel are in line with prevailing rates in this District and have been approved by other federal and state courts. Zeldes Decl. ¶ 46; Flannery Decl. ¶ 4; Lindemann Decl. ¶ 6.

### iii.    A Positive Multiplier Is Justified

A court may reduce or enhance the lodestar figure based on "a host of 'reasonableness' factors, 'including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment.'" *In re Bluetooth*, 654 F.3d at 942.

Based on these factors, as further explained below, Class Counsel submit that the requested multiplier of 1.067 is modest and more than merited given the excellent results obtained on a contingency basis, in this complex case. *See, e.g.*, *Vizcaino*, 290 F.3d at 1051 & Appendix (approving multiplier of 3.65 and citing cases with multipliers as high as 19.6); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 3:15-md-2672, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) ("'Multipliers in the 3-4 range are common in lodestar awards for lengthy and complex class action litigation.'") (quoting *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298-99 (N.D. Cal. 1995)); *Craft v. County of San Bernardino*, 624 F. Supp. 2d 1113,

1125 (C.D. Cal. 2008) (upholding 25% of the fund award resulting in a multiplier of approximately 5.2, and citing cases in support); *Wershba v. Apple Computer*, 91 Cal. App. 4th 224, 255 (2001) ("Multipliers can range from 2 to 4 or even higher."); *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) ("In recent years multipliers of between 3 and 4.5 have become common") (citation omitted); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) (holding "modest" multiplier of 4.65 "fair and reasonable"); *In re Facebook Biometric Info. Privacy Litig.*, 522 F. Supp. 3d 617, 633 (N.D. Cal. 2021) (holding multiplier of 4.71 "reasonable"); *Thomas v. Dun & Bradstreet Credibility Corp.*, No. 15-03194 BRO (GJSX), 2017 U.S. Dist. LEXIS 235064, at *70-71 (C.D. Cal. Mar. 23, 2017) (holding multiplier of 3.92 "reasonable" and "well within the range allowed by the Ninth Circuit").

Class Counsel secured an exceptional settlement for the Class valued in excess of $216 Million. *See supra*, § III.A. Further, the complexity of this case required experienced legal skills and high-quality work. The "prosecution and management of a complex national class action requires unique legal skills and abilities" that are to be considered when determining a reasonable fee. *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008) (citation omitted). This case presented complex and unique challenges that required lawyering equal to those intense and multifaceted challenges. Plaintiffs' privacy claim under Streets & Highways Code section 31490 presented a matter of first impression, and no case under this code has gone to trial. Further, Class Counsel represented a class consisting of more than 15 million drivers in California. The circumstances of the PII transmissions also presented significant technical challenges, requiring Class Counsel to understand the complicated data systems at issue, conduct site visits, and formulate a plan for presenting evidence concerning those systems to a jury in a comprehensible manner, and reliance on experts. Zeldes Decl. ¶ 47.

Class Counsel in this matter have extensive experience litigating and serving as counsel in numerous consumer class actions, including in other consumer, privacy and data breach cases. (*See* Zeldes Decl., Ex. 3; Flannery Decl. Ex. 3; Lindemann Decl., Ex. 3.). Plaintiffs' Counsel have spent 26,210.05 hours actively litigating this case. Zeldes Decl. ¶ 38; Flannery Decl. ¶ 5, Ex. 4-5; Lindemann Decl. ¶ 6. All demonstrated substantial skill, expertise, and diligence, which resulted in one of the most successful settlements achieved in a tolling case.

Additionally, "[t]he quality of opposing counsel is important in evaluating the quality of Class Counsel's work." *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 449 (E.D. Cal. 2013). Here, Defendant 3M is one of the three largest companies in the United States and is represented by one of the largest law firms in the country. Defendants TCA and OCTA are two public entities represented by prominent law firms and counsel well versed in defending the Toll Roads in other actions.  That Plaintiffs achieved such an excellent result against such formidable opponents is yet another factor supporting the requested multiplier.

The requested multiplier is further justified because this case presented a significant risk of non-payment. *In re Omnivision*, 559 F. Supp. 2d at 1047; *Vizcaino*, 290 F.3d at 1048. Consumer privacy cases are especially risky, expensive, and complex because the law is constantly evolving and there are numerous hurdles that Plaintiffs must overcome before getting to trial, including class certification and summary judgment. Establishing a cognizable injury tied to Defendants' conduct can present serious challenges. *See, e.g.*, *Krottner v. Starbucks Corp.*, 406 F. App'x 129 (9th Cir. 2010) (holding that, although plaintiffs established injury-in-fact for standing purposes, they failed adequately to allege damages for purposes of their negligence claim). Were the case to proceed in litigation, there would be numerous expert reports, costly expert depositions, and *Daubert* proceedings that risk excluding Plaintiffs' expert testimony.

PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS AND SERVICE AWARDS

The risks here are underscored by the Court's ruling on the Key Questions Motion. Not only does the Court's ruling on that motion (Dkt. 566) demonstrate that rulings can and will go against Plaintiffs at times but, as a result of that ruling, Plaintiffs would be forced to litigate a much smaller case going forward.

That the considerable risks here were undertaken by Plaintiffs' Counsel on an entirely contingent basis further justifies the requested multiplier. *See Vizcaino*, 290 F.3d at 1050; *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 at 70.[10] "It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for wining contingency cases." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994). Counsel's "substantial outlay" of time and money and the significant risk that none of it would be recovered, further supports Class Counsel's requested modest multiplier. *In re Omnivision*, 559 F. Supp. 2d at 1047.

### 4.  The Requested Amount Is Comparable to Attorneys' Fees Awarded in Other Cases

In determining whether an award is reasonable, courts may look to awards made in similar cases. *See Vizcaino*, 290 F.3d at 1050 n.4. Where the percentage of the fund method is employed, it is well established that 25% of a common fund is a presumptively reasonable amount of attorneys' fees. *See, e.g., In re Bluetooth*, 654 F.3d at 942 ("[C]ourts typically calculate 25% of the fund as a 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure."). However, "in most common fund cases, the award exceeds"

---

[10] Although the *Bluetooth* court suggested that "whether the fee was fixed or contingent" is "no longer [a] valid" factor, citing *Davis v. City and County of San Francisco*, 976 F.2d 1536, 1546 (9th Cir. 1992), *Vizcaino*, which post-dates *Davis*, suggests otherwise, and the *Bluetooth* court nonetheless considered "the risk of nonpayment" among the "'reasonableness' factors" courts should consider when awarding fees. *In re Bluetooth*, 654 F.3d at 942.

the 25% benchmark. *Knight v. Red Door Salons, Inc.,* No. 08-01520 SC, 2009 WL 248367, at \*6 (N.D. Cal. Feb. 2, 2009).

The request here is modest both in absolute and in percentage-of-fund terms, compared with awards in other consumer cases. For instance, the fee requested here compares favorably with that awarded in *Home Depot* where relying primarily on the lodestar method, the court approved a fee award of $7,536,497.80 after applying a 1.3 multiplier to counsel's base lodestar of $5,797,306, where the settlement featured a $13 million settlement fund, and was valued at $27 million total. *In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No.: 1:14-md-02583-TWT, 2016 WL 11299474, at \*1-2 (N.D. Ga. Aug. 23, 2016) (granting fee motion); *see also id.* No.: 1:14-md-02583-TWT, at Dkt. 226-1 (explaining settlement benefits in detail in motion for final approval).

The *Anthem* court applied the percentage-of-fund approach to award plaintiffs' counsel in that data breach case 27% of the settlement fund, for a total of $31.05 million. *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at \*16 (N.D. Cal. Aug. 17, 2018). Similarly, the *Target* court approved a fee award of $6.75 million, which represented 29% of defendant's total payout, which included a $10 million settlement fund. *In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-md-02522, 2015 WL 7253765, at \*3 (D. Min. Nov. 17, 2015) (affirmed on this point, *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 977 (8th Cir. 2018)).

Not only does the request here compare favorably with awards in data breach cases, but the request also compares favorably with awards in privacy cases. The *Facebook* court applied the percentage-of-fund approach to award class counsel 15% of the settlement fund for a total of $97.5 million. *In re Facebook Biometric Info. Privacy Litig.*, 522 F. Supp. 3d at 632. The *Vizio* court found that an upward departure from the 25% benchmark was justified and accordingly awarded plaintiffs' counsel 33% of the settlement fund for a total of $5.61 million. *In re Vizio, Inc.*, No. 8:16-ml-02693-JLS-

KES, 2019 U.S. Dist. LEXIS 239976, at *33-40 (C.D. Cal. July 31, 2019). Similarly, the *Raffin* court awarded class counsel 33% of the settlement fund for a total of $1.65 million. *Raffin v. Medicredit, Inc.*, No. CV 15-4912 MWF (9JWx), 2018 U.S. Dist. LEXIS 232064, at *15-17 (C.D. Cal. Nov. 30, 2018). The *Thomas* court approved a fee award of $2.835 million, which represented 27% of defendant's total payout. *Thomas*, 2017 U.S. Dist. LEXIS 235064, at *71. Furthermore, the *Netflix* court approved a fee award of $2.25 million, which represented 25% of defendant's total payout. *In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD, 2013 U.S. Dist. LEXIS 37286, at *28-29 (N.D. Cal. Mar. 18, 2013).

Here, as explained above, were this Court to use the percentage approach, the request would compare favorably: Class Counsel's fee request represents some 9.6% of the current estimated Settlement Value of approximately $217 million.

### B.    Class Counsel's Expenses Are Reasonable

Under well-settled law, Class Counsel are entitled to recover "out-of-pocket expenses that would normally be charged to a fee-paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (internal citation and quotation marks omitted). It is appropriate to reimburse Class Counsel for such expenses from the common fund. *See, e.g.*, *Leonard, et al. v. Baumer (In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.*), No. CV87-3962RN(GX), 1989 WL 73211, at *6 (C.D. Cal. Mar. 9, 1989). To date, Plaintiffs' Counsel have collectively incurred $571,972.15 in unreimbursed litigation costs. Zeldes Decl. ¶ 53-54, Flannery Decl. ¶7, Exs. 4-5; Lindemann Decl.¶ 7.[11] The costs for which Class Counsel seek reimbursement were reasonably necessary for the continued prosecution and resolution of this litigation (Zeldes Decl. ¶ 56) and were incurred by Plaintiffs' Counsel for the benefit of Class Members with no guarantee that they would be reimbursed. *See Staton*, 327 F.3d at 974

---

[11] Plaintiffs are seeking reimbursement of costs of $31,458.47 from the 3M Settlement, $432,410.95 from the TCA Settlement and $108,102.73 from the OCTA Settlement.

1   (class counsel are entitled to reimbursement of expenses they reasonably incurred).

2   Plaintiffs' Counsel's litigation costs are reasonable in amount and the Court should

3   approve their reimbursement.

4   **C.   The Requested Class Representatives' Service Awards Are Reasonable**

5   "It is well-established in this circuit that named plaintiffs in a class action are

6   eligible for reasonable incentive payments, also known as service awards." *Viceral v.*

7   *Mistras Group, Inc.*, No. 15-cv-02198-EMC, 2017 WL 661352, at *4 (N.D. Cal. Feb.

8   17, 2017) (citation omitted). Service awards, which are discretionary, "are intended to

9   compensate class representatives for work done on behalf of the class, to make up for

10  financial or reputational risk undertaken in bringing the action." *Rodriguez v. W. Publ'g*

11  *Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

12  The Court should grant the modest Service Awards of $15,000 to $23,000 each to

13  the Class Representatives to compensate them for the effort and risk entailed in pursuing

14  this litigation. See FN 1 for the amount sought for each Class Representative. These

15  Class Representatives have been enthusiastic and active, and have fought for the best

16  interests of the Classes. (Zeldes Dec. at ¶ 57). They investigated the matter prior to and

17  after retaining their respective attorneys, reviewed and approved their original

18  complaints, the Complaint, discovery, and other documents, kept in contact with counsel

19  to monitor the progress of the litigation, sat for grueling full-day depositions in which

20  counsel for five defense teams participated and grilled them on their claims and facts,

21  and reviewed and communicated with their respective Class Counsel regarding the

22  Settlement Agreement and its exhibits. (Zeldes Decl.¶ 58). Each put their name and

23  reputation on the line for the sake of the Class, and no recovery would have been possible

24  without their critical role. Equal or greater amounts have been awarded in other

25  consumer cases. *Raffin*, 2018 U.S. Dist. LEXIS 232064, at *19-20 (awarding class

26  representative award of $15,000 to the lead plaintiff); *Bellinghausen v. Tractor Supply*

27  *Co.*, 306 F.R.D. 245, 267-68 (N.D. Cal. 2015) (noting that "[h]igher awards are

sometimes given in cases involving much larger settlement amounts" and awarding a class representative award of $10,000 in a $1 million settlement); *Gaston v. Lexisnexis Risk Solutions*, No. 5:16-cv-00009-KDB-DCK, 2021 U.S. Dist. LEXIS 97538, at *21 (W.D.N.C. May 24, 2021) (awarding a class representative award of $20,000 to the lead plaintiff).

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court award Service Awards to the named representatives in the amount of $15,000 to $23,000 each as outlined above, attorneys' fees in the amount of $20,737,500 and litigation costs in the amount of $571,972.15.

Dated: October 25, 2021

**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**

_____

HELEN I. ZELDES (SBN 220051)
*hzeldes@sshhzlaw.com*
BEN TRAVIS (SBN 305641)
*btravis@sshhzlaw.com*
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 400-4990
Facsimile: (310) 399-7040

**LINDEMANN LAW FIRM, APC**
BLAKE J. LINDEMANN, SBN 255747
433 N. Camden Drive, 4th Floor
Beverly Hills, CA 90210
Telephone: (310) 279-5269
Facsimile:  (310) 300-0267
E-Mail:      blake@lawbl.com

PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS AND SERVICE AWARDS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**CUNEO GILBERT & LADUCA, LLP**
MICHAEL J. FLANNERY
500 North Broadway, Suite 1450
St. Louis, MO 63102
Telephone: (314) 226-1015
Fax:          (202) 789-1813
E-Mail:      mflannery@cuneolaw.com

***Co-Lead Class Counsel.***