1  **SCHONBRUN SEPLOW HARRIS**
   **HOFFMAN & ZELDES, LLP**
2  HELEN I. ZELDES (220051)
   hzeldes@sshhzlaw.com
3  BEN TRAVIS (305641)
   btravis@sshhzlaw.com
4  501 W. Broadway, Suite 800
   San Diego, CA 92101
5  Telephone: (619) 400-4990
   Facsimile: (310) 399-7040
6
7
8  *Co-Lead Class Counsel*
9  [*Additional counsel listed on signature page*]
10
11               **UNITED STATES DISTRICT COURT**
         **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**
12
13  In re TOLL ROADS LITIGATION          Case No:  8:16-cv-00262 ODW (ADSx)
14  _____      District Court Judge: Otis D. Wright II
15  PENNY DAVIDI BORSUK, *et al.*,       Magistrate Judge:  Autumn D. Spaeth
16
17          Plaintiffs,                   **NOTICE OF MOTION AND**
                                          **MOTION; MEMORANDUM OF**
18     vs.                                **POINTS AND AUTHORITIES IN**
                                          **SUPPORT OF PLAINTIFFS'**
19                                        **MOTION FOR FINAL APPROVAL**
20  FOOTHILL/EASTERN                      **OF CLASS ACTION SETTLEMENTS**
    TRANSPORTATION CORRIDOR
21  AGENCY, *et al.*,
22                                        Date:       January 4, 2022
          Defendants.                     Time:       10:00 a.m.
23                                        Location:   Judicate West
24                                                    (Via Zoom)
25
26                                        (**Referred to Special Master: Hon.**
27                                        **Andrew J. Guilford (ret.)**)
28

_____
        PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 4, 2022, at 10:00 a.m., or as soon thereafter as the matter may be heard, at Judicate West, 1851 East First Street, Suite 1600, Santa Ana, CA 92705 before the Honorable Andrew J. Guilford (Ret.), presiding as Special Master, Plaintiffs will and hereby do move the Court for an Order granting this motion for final approval; finding the Settlements fair, reasonable, and adequate and approving them under Rule 23(e); finally certifying the Settlement Classes; finding the class notice as implemented satisfied Rule 23 and due process; finally appointing Class Counsel; finally appointing the Settlement Class Representatives; finally appointing Epiq Class Action and Claims Solutions, Inc. ("Epiq") as the Settlement Administrator and awarding its costs; entering judgment, and any other relief the Court deems just and proper, all in accordance with the Parties' Settlement Agreements and this Court's orders granting preliminary approval of the Settlements. The Parties' proposed Orders and Judgments are lodged concurrently herewith.[1]

Please take notice that the hearing will take place remotely via Zoom. The access information for the hearing may be requested at the following link: https://tollroadssettlements.com/Request.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Class Action Settlement Agreements and Releases (the "Settlements") previously filed with the Court (Dkts. 585-4, 585-5, 594-3), the Declaration of Helen I. Zeldes, the Declaration of Cameron R. Azari, Esq. on Implementation and Adequacy of TCA and 3M Settlement Notice Plan, the Declaration of Cameron R. Azari, Esq. on Implementation and Adequacy of OCTA Settlement Notice Plan, any Supplemental Declarations submitted by Cameron R. Azari, all papers filed in support of the above, the argument of counsel at the hearing of

---

[1] For the OCTA Settlement, the proposed Judgment is a separate document from the Final Approval Order.

this Motion, all papers and records on file in this matter, and such other matters as the Court may consider.

Dated: December 7, 2021

**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**

_____

HELEN I. ZELDES (SBN 220051)
*hzeldes@sshhzlaw.com*
BEN TRAVIS (SBN 305641)
*btravis@sshhzlaw.com*
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 400-4990
Facsimile: (310) 399-7040


**LINDEMANN LAW FIRM, APC**
BLAKE J. LINDEMANN, SBN 255747
433 N. Camden Drive, 4th Floor
Beverly Hills, CA 90210
Telephone: (310) 279-5269
Facsimile: (310) 300-0267
E-Mail:      blake@lawbl.com

**CUNEO GILBERT & LADUCA, LLP**
MICHAEL J. FLANNERY, SBN 196266
500 North Broadway, Suite 1450
St. Louis, MO 63102
Telephone: (314) 226-1015
Fax:          (202) 789-1813
E-Mail:      mflannery@cuneolaw.com

*Co-Lead Class Counsel*

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND ............................................................................................. 2

   A. The Complaint ............................................................................................ 2

   B. Litigation History ...................................................................................... 2

      1. Motions to Dismiss ................................................................................. 2

      2. Discovery .................................................................................................. 3

      3. Motions for Judgment on the Pleadings ............................................... 3

      4. Class Certification and Ninth Circuit Appeal ..................................... 3

      5. Motions for Summary Judgment ........................................................... 4

      6. Motion for Ruling on Key Questions .................................................... 4

      7. Settlement Negotiations ......................................................................... 5

         a.   Board Approval of the Settlements ................................................. 6

         b.   Settlement Agreement Negotiations and Selection of Administrator ... 7

         c.   Settlement Administration ............................................................... 8

         d.   Highly Technical Nature of the Case ............................................. 8

III.    THE SETTLEMENT TERMS ........................................................................ 8

   A. The TCA Settlement ................................................................................... 8

      1. The TCA Settlement Class Definition ................................................... 8

      2. The Settlement Benefits .......................................................................... 9

         a.   Cash Payments to Class Members ................................................ 10

         b.   Penalty Forgiveness to TCA Class Members ................................ 10

         c.   Remedial Measures Attributable to the Settlement ..................... 10

      3. The TCA Settlement's Value to Class Members ................................. 12

      4. Plan of Distribution to the TCA Settlement Class ............................. 13

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS

## TABLE OF CONTENTS - CONT'D

5. Notice to the TCA Class.................................................................13

6. Proposed TCA Class Representative Service Awards ..............................14

7. Attorneys' Fees and Costs ...........................................................15

8. The Settlement Administrator .......................................................17

B. THE 3M SETTLEMENT ..................................................................18

1. The 3M Settlement Class Definition ...............................................18

2. The 3M Settlement Benefits..........................................................18

   a.   Cash Payments to 3M Class Members ...............................19

   b.   Plan of Distribution to the 3M Settlement Class ..................19

   c.   Notice to the 3M Settlement Class .................................19

   d.   Proposed 3M Class Representative Service Awards ...........19

3. Attorneys' Fees and Costs ...........................................................20

4. The 3M Settlement Administrator..................................................21

C. The OCTA Settlement .................................................................21

1. The Settlement Class Definition ...................................................21

2. The Settlement Benefits .............................................................22

   a.   Cash Payments ........................................................22

   b.   Penalty Forgiveness ..................................................22

   c.   Remedial Measures Attributable to the Settlement .............23

3. Notice to the Class....................................................................24

4. Proposed Class Representative Service Award.......................................24

5. Attorneys' Fees and Costs ...........................................................25

6. The Class Administrator..............................................................26

# TABLE OF CONTENTS - CONT'D

IV.    CAFA Notice and Notice to the Classes ...................................................26

V.     THE REACTION OF THE CLASS MEMBERS TO THE SETTLEMENTS
       HAVE BEEN OVERWHELMINGLY POSITIVE .......................................26

VI.    THE SETTLEMENT CLASSES SHOULD BE CERTIFIED .....................27

VII.   THE SETTLEMENTS SHOULD BE FINALLY APPROVED ..................28

       A. Rule 23(e) Analysis ........................................................................28

       B. Ninth Circuit Final Approval Factors.............................................29

VIII.  THE NOTICE PLANS MET THE REQUIREMENTS OF DUE
       PROCESS .........................................................................................31

IX.    CONCLUSION ..................................................................................32

# TABLE OF AUTHORITIES

*Federal Cases*                                                                          *Page(s)*

*Amchem Prods. v. Windsor,*
   521 U.S. 591 (1997) .................................................................... 27

*Ellis v. Costco Wholesale Corp.,*
   657 F.3d 970 (9th Cir. 2011) ...................................................... 27

*Farrell v. Bank of America, N.A.,*
   827 F. App'x 628  (9th Cir. 2020) .............................................. 16

*Glass v. UBS Fin. Servs., Inc., No. C-06-4068 MMC,*
   2007 WL 221862 (N.D. Cal. Jan. 26, 2007) ............................ 27

*In re Apollo Grp. Inc. Sec. Litig.,*
   214 F. Supp. 3d 877 (C.D. Cal. 2016) ...................................... 27

*In re Bluetooth Headset Products Liab. Litig.,*
   654 F.3d 935 (9th Cir. 2011) ...................................................... 29

*In re Vizio, Inc., No. 8:16-ml-02693-JLS-KES,*
   2019 U.S. Dist. LEXIS 239976 (C.D. Cal. July 31, 2019) .................. 27

*Mercury Interactive Corp. Sec. Litig. v. Mercury Interactive Corp.,*
   618 F.3d 988 (9th Cir. 2010) ............................................ 17, 20

*Mullane v. Central Hanover Bank & Trust Co.,*
   339 U.S. 306 (1950) .................................................................... 31

*Satchell v. Fed. Exp. Corp., Nos. 03-cv-2659-SI,*
   2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ..................... 28-29

*Staton v. Boeing Co.,*
   327 F.3d 938 (9th Cir. 2003) ...................................................... 16

*Turner v. Murphy Oil USA, Inc.,*
   472 F. Supp. 2d 830 (E.D. La. 2007) ...................................... 16

*Federal Statutes*

28 U.S.C. § 1715 ........................................................................ 26, 30

*State Statutes*

Streets and Highways Code § 27565 .......................................... 5

## TABLE OF AUTHORITIES – CONT'D

*State Statutes - Continued*                                                                       *Page(s)*

Streets and Highways Code § 31490 ..................................................................... *passim*

*Other*

Fed. R. Civ. P. 23 .............................................................................................. *passim*

Manual for Complex Litigation, § 21.632 ................................................................ 27

Manual for Complex Litigation (Fourth)§ 21.7 (2004) ........................................ 16-17

Principles of the Law of Aggregate Litigation, § 3.13 ............................................. 16

# I.    INTRODUCTION

During the six years of hard fought litigation in this matter of first impression, Plaintiffs achieved certification of an important Privacy Class comprised of approximately fifteen million California drivers, defended that certification on appeal to the Ninth Circuit, survived multiple motions for judgment on the pleadings and summary judgment, engaged in lengthy, comprehensive and contentious discovery, engaged in five hard-fought and arms-length mediations before three mediators, and then, on the brink of trial, negotiated outstanding settlements that provide over $215 million in relief for the Settlement Classes as well as meaningful remedial measures that go to the heart of the claims Plaintiffs brought in the litigation.

The Court preliminarily approved the proposed settlements ("Settlements") of this class action, and the Settlement Administrator has disseminated notice to Class Members in accordance with the Settlement Agreements and the Preliminary Approval Orders. That robust notice plan has resulted in approximately 1,335,442 claims being submitted.[2] In addition, approximately one million additional Class Members will be receiving penalty forgiveness from either the TCA or OCTA Settlement, who were not required to submit a claim to obtain that relief. In total, Plaintiffs estimate that approximately two million Class Members will be receiving monetary relief from these exceptional Settlements. By contrast, only 485 persons have opted out (.003% of the approximate number of Class Members). Only one class member has objected.[3] As evidenced by the overwhelmingly positive response to the Settlements, and as the Court

___

[2] 299,298 claims were submitted to be considered for cash awards in the 3M settlement, 739,278 in the TCA settlement, and 296,866 in the OCTA settlement. *See* Azari TCA Decl. ¶48; Azari OCTA Decl. ¶47.  Class Members could file claims for more than one settlement, final numbers will be provided by Epiq in its supplemental declaration.

[3] The sole objection filed with the Court only objects to the TCA Settlement, not to the 3M or OCTA Settlements. Plaintiffs believe this objection will likely be withdrawn before the Fairness Hearing, but if it is not, they will respond in full on or about December 21, 2021.

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS

found in its Preliminary Approval Orders, Plaintiffs respectfully request that the Court conduct a final review of the Settlements and approve them as fair, reasonable, and adequate.

## II.     BACKGROUND

### A.     The Complaint

This action was initially filed in the Orange County Superior Court on October 2, 2015, based on a government claim act letter served on February 26, 2015, and later removed to federal court on February 16, 2016. Plaintiffs' Complaint brought a claim under *Streets and Highways Code § 31490*[4] (the only cause of action to which class certification was granted) which alleged that Defendants improperly provided PII of users and subscribers of the Toll Roads (including Plaintiffs) to dozens of third parties in violation of § 31490(a), subjecting them to statutory damages of $2,500 per violation under § 31490(q). Plaintiffs also alleged that Defendants violated other laws and statutes, including an excessive fines claim (stemming from penalties they imposed), a due process claim (stemming from their violation notices, administrative review procedures and lack of signage) as well as several other claims. This action is the first case that has ever been filed concerning alleged violations of *Streets and Highways Code § 31490* and presented numerous legal and factual issues of first impression.

### B.     Litigation History

#### 1.     Motions to Dismiss

The TCA and OCTA filed Motions to Dismiss that were granted in part and denied in part on December 20, 2016, through which, nearly all Plaintiffs' claims were dismissed with leave to amend. Plaintiffs filed the operative Complaint on January 19, 2017. Defendants TCA, 3M and BRiC answered that Complaint on February 14, 2017. OCTA answered on February 15, 2017 and Cofiroute answered on March 6, 2017.

#### 2.     Discovery

---

[4] This statute was enacted on September 29, 2010, SB1268.

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS

Discovery efforts in the litigation were intense, wide-ranging and extensive, on both sides, and the Parties engaged in constant meet and confer efforts regarding numerous complex discovery issues, with motion practice requiring the Court's intervention on multiple occasions, as well as resolving many issues outside of Court. Plaintiffs undertook comprehensive and ambitious discovery into all five Defendants' conduct, including the production of and review of over 500,000 pages of documents, depositions of 34 witnesses, expert discovery, a site inspection of TCA's VTX System and a site inspection of the computerized database and software system maintained by Cofiroute on behalf of OCTA. *See* Zeldes Decl. at ¶6.  Discovery took place over the course of 40 months, with multiple motions filed and fully litigated during that time.  *Id*. Third party subpoenas were issued to 15 parties, and depositions of those third parties were also undertaken.  *Id*.

### 3.      Motions for Judgment on the Pleadings

Defendants filed Motions for Judgment on the Pleadings on March 24, 2017. After extensive briefing and oral argument, the Court granted in part and denied in part each motion on August 2, 2017. Dkt. 204. The Court dismissed Plaintiffs' Rosenthal Act claim and also dismissed Plaintiffs' claims against 3M for damages under the California Constitution. The parties continued with discovery on Plaintiffs' § 31490, negligence, constitutional privacy, due process and excessive fines claims.

### 4.      Class Certification and Ninth Circuit Appeal

Plaintiffs' Motion for Class Certification was filed on April 27, 2018 and fully briefed over the course of the next two months, leading to a full class certification hearing on July 31, 2018.  *Id*. at ¶9.  The Court certified Plaintiffs' proposed Privacy Class and amended the class definition a few months later but declined to certify any other claims. Dkt Nos. 439, 501. Defendants 3M and TCA filed motions for reconsideration. 3M then filed a petition seeking permission to appeal to the Ninth Circuit under Rule 23(f), which was also denied in April of 2019.

### 5.   Motions for Summary Judgment

All five Defendants sought summary judgment on multiple occasions, requiring extensive briefing each time, and some Defendants sought reconsideration after the Court ruled.  Zeldes Decl. at ¶12. Motions for partial summary judgment were first filed in March of 2017, but later withdrawn, only to be renewed in September of 2017. Among other things, at issue in the summary judgment motions were Plaintiffs' claims under § 31490, which, over time, became the focus of the litigation.

On January 12, 2018, the Court granted summary judgment on the portion of Plaintiffs' claim based on alleged violations of the privacy policy but denied the motion without prejudice as to the rest of Plaintiffs' claim for improper sharing of PII. Dkt. 297. Discovery continued on the remainder of Plaintiffs' claims.

Defendants' third set of motions for summary judgment were filed between July 16-18, 2018.  On July 31, 2018, Plaintiffs' CLRA, UCL, and constitutional claims and request for injunctive relief against 3M were dismissed. Dkt. 440. The excessive fines claim against TCA was dismissed, but the individual due process claim survived. Almost immediately after the Court ruled on the summary judgment motions, Defendants 3M and TCA filed extensive motions for reconsideration. The Court's tentative ruling denied those motions and, after argument on those motions in late September of 2018, the motions were taken under submission. Before oral argument was held on OCTA, Cofiroute and BRiC's motions, the case was stayed to allow Defendants' Ninth Circuit petition for an appeal of the class certification to be decided and the parties to pursue possible settlement through mediation.

### 6.   Motion for Ruling on Key Questions

Over the course of the litigation, Defendants suggested to the Court that, with respect to certain issues in the case, concerning elements of the § 31490 claim, resolution of particular "key questions" would help to resolve the matter.  Defendants ultimately filed their motion on June 10, 2019, and the parties briefed the motion, but the Court

withheld its ruling on the matter for several months, which provided an impetus for settlement negotiations, leading ultimately to the 3M settlement in July 2019, followed by the TCA settlement in August 2019.

On January 17, 2020, the Court issued its ruling on Defendants' Key Questions Motion. In its ruling, the Court found that certain types of transmissions for interoperability and/or collection and enforcement did not violate Section 31490. [Dkt. No. 566] With respect to intrastate interoperability, the Court found that Section 31490 permits Defendants to send information to another transportation agency for interoperability under subsection (a) of section 27565 of the Streets and Highways Code, including, but not limited to, the date and time, toll plaza, and lane of that other agency's accountholder's use of its toll road.  The Court additionally found that certain other transmissions for collection and enforcement purposes did not violate Section 31490, such as transmissions of information to the DMV or vendors to identify the registered owner and address or to car rental companies. The Court found that providing information to a third-party collection agency to collect unpaid delinquent tolls and penalties was permitted by Section 31490 but insufficient information had been presented to show whether or not the information provided was required for enforcement and collection purposes.  With respect to certain other transmissions, the Court found that it was unable to make a ruling due to unresolved factual issues.

### 7.    Settlement Negotiations

The parties engaged in *five* mediations over the course of this litigation before the case was able to be fully resolved as to all Defendants.  The first mediation occurred in January 2017 with all parties participating in a mediation before Lynn Frank.  Despite a full day of negotiations, the mediation was unsuccessful.

On February 25, 2019, Plaintiffs and all defendants participated in a mediation with Robert Kaplan. Hard fought, intensive and arms'-length negotiations over the course of a full day did not result in a settlement.

On April 25, 2019, Plaintiffs and 3M participated in a second mediation with Mr. Kaplan. The parties made progress toward a resolution and agreed to continue settlement discussions with the assistance of Mr. Kaplan. Over the course of the next three months, involving multiple arms'-length communications and further negotiations between and among the parties and Mr. Kaplan, the parties reached a settlement in principle on July 16, 2019. *See* Zeldes Decl. at ¶14.

On August 21, 2019, Plaintiffs and the TCA Defendants (including BRiC) participated in a marathon mediation with Rachel Ehrlich, which lasted for 19 hours, concluding at 4:30 a.m. in the morning of August 22. *Id*. at ¶15. The mediation resulted in a settlement in principle with the signing of a term sheet. Over the course of the next several months, Plaintiffs and the TCA Defendants spent considerable time with the assistance of Ms. Ehrlich working out the details of the Settlement Agreement. *Id.*

The Court's January 17, 2020 Order on Key Questions paved the way for Plaintiffs and the OCTA Defendants to resolve their remaining issues.  Plaintiffs and the OCTA Defendants participated in a final mediation with Mr.  Kaplan on March 2, 2020. The parties made significant progress toward a resolution, including a conceptual agreement on many of the basic terms of a settlement. Mr. Kaplan submitted a Mediator's Proposal, which was accepted by all of the Parties subject to approval of the OCTA Board of Directors.

### a.    Board Approval of the Settlements

The TCA and OCTA settlements were subject to the approval of the boards that oversee their operations and were put to a vote of the respective agencies' boards following the conclusion of the mediation efforts described above.  The TCA and the OCTA settlements were approved by their respective boards.

### b.    Settlement Agreement Negotiations and Selection of Administrator

While a settlement in principle was reached on July 16, 2019 with Defendant 3M, on August 22, 2019 with Defendants TCA and BRiC, and on March 13, 2020 with Defendants OCTA and Cofiroute, it took the parties months of arduous negotiations over the terms of the Settlement Agreements.  Zeldes Decl. ¶17.   These efforts, like literally every aspect of this litigation, were arms-length and hard fought. As the Special Master noted regarding the Ruling on Key Questions, "The Court had long proposed to make such rulings to facilitate the advancement of the case, and they ultimately affected numerous aspects of it. At the hearing, Plaintiffs' counsel agreed that the proceedings related to the Key Legal Questions Order, including the Court's agreement to hold the order while the parties negotiated potential settlements, were critical in the parties' ability to resolve the case. For these reasons, the Special Master is more than satisfied that these settlements represent a non-collusive compromise between the parties' strongly held and disputed positions." Dkt. 585, 594.

Class Counsel also spent significant time obtaining bids from and negotiating with six third-party administrators in order to get the best deal for the Class. After soliciting and reviewing competing bids for administration of the Settlement, the Parties agreed that due to its extensive experience in large complex notice programs and its involvement with the class certification notice in the case, Epiq was best suited to handle this complex notice and administration program. Class Counsel also worked closely with Epiq to hone the notices and claim forms to comply with applicable law. Zeldes Decl. ¶¶18-19.

Finally, Class Counsel prepared and filed the three Settlement agreements[5] along with the Motions for Preliminary Approval (Dkts. 585-4, 585-5, 594-3), which the Court granted on May 17th, 2021. (Dkts. 599, 600).

### c.    Settlement Administration

---

[5] Plaintiff James Watkins is not a party to any of the Settlements.

Since the Preliminary Approval Order, Class Counsel have worked alongside Epiq to ensure the notice and claims process proceeds smoothly for the Class Members. Class Counsel have repeatedly reviewed the website to ensure accuracy and maintain user friendly access, have reviewed weekly reports from -- and conferred with -- Epiq about the progress of the claims process, and responded to inquiries from Class Members that came into their respective offices. Zeldes Decl. ¶19.

### d.     Highly Technical Nature of the Case

The highly technical nature of this case also required significant work by experts. Due to the sensitive and highly technical nature of the government entities' computer systems, Class Counsel and their affirmative experts, spent several weeks reviewing voluminous reports, queries, data, computer systems and programs, to allow Plaintiffs to tender evidence of Defendants' PII sharing practices.

## III.    THE SETTLEMENT TERMS

### A.     The TCA Settlement

#### 1.     The TCA Settlement Class Definition

The proposed TCA Settlement Class is defined as follows:

- All individuals whose PII was provided by Defendants[6] to any other individual or entity between April 13, 2015 and the Settlement Class Period End Date[7], except as otherwise specified. The Settlement Class consists of:

- Any person with a transponder account with a Toll Agency whose PII was sent by Defendants to another Toll Agency between April 13, 2015 and the Settlement Class Period End Date (The Interoperability Subclass");

- Any person who used any of the TCA Toll Roads whose PII was sent by

---

[6] "Defendants" refers to the TCA, BRiC and 3M defendants only in this Settlement Agreement.

[7] Settlement Class Period End Date is defined as thirty (30) days after the Court issues the Preliminary Approval Order. The Settlement Class Period End Date was June 16, 2021.

Defendants to a third party between April 13, 2015 and the Settlement Class Period End Date in connection with TCA Defendants' efforts to collect tolls and/or penalties (the "Collection/Enforcement Subclass"); and

- Any person whose PII was sent by Defendants to a third party between April 13, 2015 and the Settlement Class Period End Date for any reason other than those listed above (the "Communications Subclass").

Excluded from the Settlement Class are: (1) employees of TCA Defendants, including their current and former directors, officers and counsel; (2) any entity that has a controlling interest in TCA Defendants; (3) TCA Defendants' affiliates and subsidiaries; and (4) the judge to whom this case is or was assigned, any member of the judge's immediate family, and any member of the judge's staff.

### 2.    The Settlement Benefits

The total TCA settlement includes $29 million dollars in cash, $135 million dollars in penalty forgiveness and substantial injunctive and programmatic relief (changes to the TCA's practices). Specifically, the TCA settlement provides:

### a.    Cash Payments to Class Members

The TCA will contribute $29 million dollars to a non-reversionary cash Settlement Fund. All Settlement Class Members who submitted valid Claim Forms and are not eligible for penalty forgiveness will receive Cash Awards from the TCA Settlement Fund on a pro-rata basis.[8]

### b.    Penalty Forgiveness to TCA Class Members

The TCA will also provide a substantial $135 million dollars in penalty forgiveness to Settlement Class Members with outstanding penalties. The Penalty Forgiveness amount will be distributed in two steps: First, all Participating Penalty

---

[8] The Settlement provides that unconfirmed claims will receive half of a pro rata share. An unconfirmed claim is a claim submitted attesting to membership in the Settlement Class but whose identifying information does not allow the Class Administrator to either confirm or reject membership in the Settlement Class.

Forgiveness Class Members will receive the lesser of the total of their outstanding penalties or $57.50 (the equivalent of at least one penalty assessment) in penalty forgiveness.  Second, the remainder of the Penalty Forgiveness Fund will be distributed to Penalty Forgiveness Class Members from those with the oldest outstanding penalties to the newest. There is no requirement to submit a Claim Form to receive penalty forgiveness, it will be electronically pushed out to Penalty Forgiveness Class Members.

### c.      Remedial Measures Attributable to the Settlement

In addition to the cash and penalty forgiveness, additional benefits of the Settlement are the remedial measures that the TCA will enact as a result of this litigation, which will benefit all Class Members regardless of whether they submit a claim.  The remedial measures include, but are not limited to:

### i.   Increasing the TCA's Grace Period from Five to Seven Days to Pay Tolls

The TCA has agreed to increase the time that drivers have to pay their tolls before a Notice of Toll Evasion is issued from 5 days to 7 days (a 40% increase in the grace period).

### ii.   Editing the TCA's Privacy Policy to Provide More Information about Third Party Transmissions of PII

The TCA has agreed to change their privacy policy to include a list of the categories of PII sent to any third party, including but not limited to entities that belong to the California Toll Operators Committee ("CTOC"), and a separate list of the categories of PII the TCA receives from other Toll Agencies.

### iii.   Reset ALL TCA Advertising Opt-Ins to Opt-Out

The TCA will remove the opt-in status all for all current subscribers in the VTX system (governing opt-ins for communications by TCA) if the Court approves that they can send (i) a single email to all account holders notifying them that they have been

opted out and asking them to select their communications preferences in their online account; and (ii) a statement to be included in any other communications that would otherwise be sent to TCA customers advising them to update their communications preferences and/or containing a link to a website that allows TCA customers to update their communications preferences.

### iv.   Limitations on the TCA's PII Transmissions Going Forward

The TCA has agreed on a going forward basis to the following limitations on its PII transmissions:

1.   When the TCA sends PII to the Franchise Tax Board ("FTB") for the purpose of placing a tax intercept, the TCA will send only the PII that the FTB requires to place such tax intercept which for the purposes of this Settlement is understood that the FTB requires the TCA to send an individual's social security number in order to place a tax intercept on such individual.

2.   When the TCA transmits PII to a rental car company as a result of a rental car traveling on State Routes 73, 133, 241, or 261 and failing to pay a toll associated with travel on such Route, the TCA will transmit only such PII as is contained in the toll violation notice resulting from the aforementioned failure to pay a toll.

3.   The TCA shall use skip tracers only in instances where: (i) mail is returned to the TCA as undeliverable, or (ii) the TCA requires the use of skip tracers to obtain information that the FTB requires to place a tax intercept. Notwithstanding the foregoing, if legislation is enacted that provides for the use of skip tracers in additional instances, the TCA shall also be permitted to use skip tracers in those additional instances.

4.    When the TCA sends PII to the California Department of Motor Vehicles ("DMV") for the purpose of causing the DMV to place a DMV registration hold, the TCA shall only send the PII that the DMV requires to place a DMV registration hold.

### v.    Miscellaneous Remedial Measures

The TCA has also provided significant revisions and improvements to its privacy policy to now disclose its current collection and sharing PII practices. *See* https://thetollroads.com/sites/default/files/Privacy_Policy_01_01_2020.pdf (last visited October 28, 2020).

### 3.    The TCA Settlement's Value to Class Members

The total cash fund that will be distributed to Settlement Class Members (after class notice and administration costs, cost of a Special Master, Class Counsel's attorneys' fees and reasonable costs and Service Awards to the Class Representatives) is $29 million dollars.  The total penalty forgiveness is $135 million dollars.  The total monetary value of the TCA settlement is thus approximately $164 million.  The value of remedial measures for consumers is not included in these numbers but is clearly of significant meaningful value to drivers on the toll roads.

### 4.    Plan of Distribution to the TCA Settlement Class

Subject to the Court's final approval, the $29 million cash will be used to fund the Cash Awards, class notice and administration costs, cost of a Special Master, Class Counsel's attorneys' fees and reasonable costs and Service Awards to the Class Representatives.  Class members who filed valid claims and are not eligible for penalty forgiveness will receive Cash Awards. Penalty Forgiveness will be automatically allocated to eligible class members, no Claim Form is required.  As discussed above, the TCA will electronically forgive outstanding penalties in two steps:  first, TCA will forgive the lesser of the Settlement Class Member's total outstanding penalties or $57.50 (the equivalent of one penalty).  Secondly, TCA will forgive up to 100% of the

Settlement Class's remaining outstanding penalties, starting with the Settlement Class's oldest penalties and proceeding to the newest. This is the way to get the most penalty forgiveness for the Class and will help get relief to class members who have been unable to renew their vehicle registrations the longest due to DMV liens as well as to those who have been subjected to FTB liens.

### 5.    Notice to the TCA Class

Pursuant to Rule 23(C)(2)(B), the Settlement Administrator provided Class Members with the Settlement Notice via U.S. Mail or email to each Class Member's last known address.  (Settlement Agreement ¶8.01; Declaration of Cameron R. Azari, Esq. on Implementation and Adequacy of TCA and 3M Settlement Notice Plan ("Azari TCA Decl.") ¶¶23-31. The printed Settlement Notice contained a detachable Claim Form allowing participating Class Members to claim in for a cash distribution.  The printed Settlement Notice also listed the website where Class Members were able to electronically submit a claim form.  Class Members who received Settlement Notice by email also received a link in the email that took them directly to the easy-to-submit Settlement Website online claim form.  For those who are members of both the TCA and 3M Settlement Classes, the Notice included both the TCA and 3M Settlements so that a Class Member only needed to submit one claim form to be considered for cash payments from both Settlements. In addition, publication notice was also utilized to reach the small portion of the class for whom the TCA did not have their contact information.

### 6.    Proposed TCA Class Representative Service Awards

Consistent with the Order on Preliminary Approval, Class Counsel filed a motion for payment of attorneys' fees, costs and service awards on October 26, 2021 (*see* Docket No. 611). Subject to Court final approval, Class Counsel seek payment of up to $15,000 service awards to each Plaintiff for their service as Class Representatives. (Settlement Agreement ¶ 4.02).  These Plaintiffs have been enthusiastic and active class

representatives. They have actively participated in the prosecution of this action by: reviewing and approving their original complaints and the Consolidated Complaint; sitting for a full-day deposition; responding to multiple lengthy sets of written discovery including ones that delved into their finances; communicating regularly with class counsel; submitting declarations in opposition to Defendants' motions for summary adjudication; and generally staying informed about the progress of the litigation and acting in the interests of the proposed classes. Each put their name and reputation on the line for the sake of the Class, and no recovery would have been possible without their critical role. *See* Dkt. 611-1 ¶57.  The proposed maximum $15,000 service awards are consistent with those approved in other consumer class action settlements that have been pending as long as this one has.[9]

### 7.    Attorneys' Fees and Costs

As part of the TCA Settlement, Class Counsel stated that they would not seek an award of fees in excess of one-third of the Settlement Value (Settlement Agreement ¶ 4.01).  The Settlement Value of the monetary component of the TCA settlement is $164 million, which includes cash and monetary forgiveness.  Class Counsel are seeking no more than $17.5 million – less than a third of the maximum amount that Class Counsel stated they would seek pursuant to Settlement Agreement.  This amount represents 10.7% of the minimum estimated Settlement Value. Such a request is well below the Ninth Circuit's 25% "benchmark" percentage for such awards. See, generally, Memorandum in Support of Plaintiffs' Motion for Attorneys' Fees, Costs and Service

---

[9]  Service Awards requested for each Class Representative:

|       | Quarles | Carpenter | Myers  | Mahda  | Golka  | Borsuk | Coulter |
|-------|---------|-----------|--------|--------|--------|--------|---------|
| 3M    | 0       | 3,000     | 3,000  | 0      | 3,000  | 3,000  | 3,000   |
| TCA   | 15,000  | 15,000    | 15,000 | 15,000 | 15,000 | 15,000 | 15,000  |
| OCTA  |         |           |        |        | 5,000  |        |         |
| totals | 15,000 | 18,000    | 18,000 | 15,000 | 23,000 | 18,000 | 18,000  |

Awards, Docket No. 611. Nonetheless, an upward adjustment above the benchmark percentage would be warranted under these circumstances.

Consistent with the Order on Preliminary Approval, Class Counsel filed a motion for payment of attorneys' fees, costs and service awards on October 26, 2021 (*see* Docket No. 611). As that motion makes clear, the $17.5 million sought is reasonable as a percentage of the fund and is also commensurate with the substantial lodestar attorneys' fees plus expenses incurred in this matter.

The Special Master "expressed some concerns about the proposed attorneys' fee award for the TCA settlement" because attorneys' fees would "be deducted solely from the non-reversionary cash fund." The Special Master asked Plaintiffs to "provide sufficient justification for the requests in their later papers to justify the majority of fees sought." Dkt. 590, at 15:5-12. To address those concerns, Plaintiffs have provided substantial authority for the proposition that courts regularly use both the cash and non-cash components of a settlement to calculate the valuation, which is in turn used to evaluate the reasonableness of the fee award requested. *See* Memorandum in Support of Plaintiffs' Motion for Attorneys' Fees, Costs and Service Awards ("Fee Petition") Dkt. 611 at 25-27. Consistent with the case law, it is appropriate to evaluate Class Counsel's fee request in light of the total value that these Settlements provide – over $215 million in total value. *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003) ("[W]here the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained . . . courts [may] include such relief as part of the value of a common fund for purposes of applying the percentage method . . . ."); *see also* Principles of the Law of Aggregate Litigation, § 3.13(b) (American Law Institute, 2010) ("[A] percentage of the fund approach should be the method utilized in most common-fund cases, with the percentage being based on both the monetary and nonmonetary value of the judgment or settlement."); *Farrell v. Bank of America, N.A.*, 827 F. App'x 628 (9th Cir. 2020) (affirming District Court Fee award based on settlement derived from $66mm

of cash and debt forgiveness).   Plaintiffs also provided support for the substantial lodestar invested and costs advanced by Class Counsel to litigate this matter.   Dkt. 611 at 20-22.

Class Counsel also ask the Court to consider that they only addressed fees after the class relief was negotiated.   In doing so, they were proceeding as "[m]ost courts and commentators agree":   *i.e.,* "that class counsel should negotiate settlement terms, including the total amount of any "common fund" separately from, and before any discussion of, attorney's fees."[10]   This is because Class counsel needs to be able to establish that they were not putting their own interests first, and giving up something the class could get. *See, e.g.*, *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 844 (E.D. La. 2007); *see also* Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.7 (2004) ("[T]he simultaneous negotiation of class relief and attorney's fees creates a potential conflict.   Separate negotiation of the class settlement before an agreement on fees is generally preferable.").

Class Counsel proceeded to press for maximum relief, and achieved a substantial settlement, worth over $215 million.   And in seeking fees from the cash portion of the settlement, they are accessing the only portion of the settlement relief that is available to them.   Plaintiffs should not be penalized for proceeding in the manner that avoided any hint of collusion; public policy considerations suggest that doing so would discourage the very strategies that maximize class member recovery.

One other note:   Class Members have had the opportunity to comment on or object to the fee petition under Rule 23(h), consistent with Ninth Circuit authority. *See Mercury Interactive Corp. Sec. Litig. v. Mercury Interactive Corp.*, 618 F.3d 988, 993-94 (9th Cir. 2010).   That only one class member filed an objection – which Plaintiffs believe

---

[10]  https://www.americanconference.com/life-insurance-litigation-regulatory-enforcement-erm-849i16-nyc/wp-content/uploads/sites/797/2016/08/11.50day2_Phillips.RobertARTICLE.pdf.doc

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS

will be withdrawn before the Fairness Hearing – suggests that the overwhelming reaction of the class is positive.

### 8. The Settlement Administrator

Consistent with the Preliminary Approval Order, Epiq Class Action & Claims Solutions, Inc.—an experienced and reputable national class action administrator— has served as Settlement Administrator, providing notice; administering and making determinations regarding claim forms; and providing other services necessary to implement the Settlement, including – subject to the Court's final approval – the processing of settlement payments and the making of distributions. (Settlement Agreement ¶¶ 6.01, 6.03, 7.01, 7.02, 8.01, 8.02, 8.04, 8.05, 8.06.) Subject to the Court's final approval, the costs of the Settlement Administrator will be paid out of the Settlement Fund (Settlement Agreement, ¶ 12.01(a)). The Settlement Administrator will submit its costs for this Settlement in a Supplemental Declaration.

### B. THE 3M SETTLEMENT

### 1. The 3M Settlement Class Definition

The proposed 3M Settlement Class is a subset of the TCA Settlement Class (the same class, just for a shorter period of time) and is defined as follows:

All individuals whose PII was provided by 3M or TCA to any other individual or entity from April 13, 2015 to June 30, 2015, including:

- Any person with a transponder account with a Toll Agency whose PII was sent by 3M or TCA from April 13, 2015 to June 30, 2015 to another Toll Agency (interoperability transmissions);

- Any person who used any of the TCA Toll Roads whose PII was sent by 3M or TCA to a third party from April 13, 2015 to June 30, 2015 in connection with efforts to collect tolls or penalties (collection transmissions); and

- Any person whose PII was sent by 3M or TCA to a third party from April

13, 2015 to June 30, 2015 for any reason other than those listed above (other transmissions).

Excluded from the Settlement Class are: (1) employees of Defendant, including their current and former directors, officers and counsel; (2) any entity that has a controlling interest in Defendant; (3) Defendant's affiliates and subsidiaries; and (4) the judge to whom this case is assigned, any member of the judge's immediate family, and any member of the judge's staff.

### 2.     The 3M Settlement Benefits

The total 3M settlement includes $11.95 million dollars in cash. Specifically, the 3M settlement provides:

### a.     Cash Payments to 3M Class Members

Defendant 3M Company will contribute $11.95 million dollars to a non-reversionary Settlement Fund. All Class Members who submitted a valid Claim Form will be eligible to receive a cash payment on a pro rata basis[11].

### b.     Plan of Distribution to the 3M Settlement Class

Subject to the Court's final approval, the $11.95 million cash will be used to fund the Cash Awards, class notice and administration costs, cost of a Special Master, Class Counsel's attorneys' fees and reasonable costs and Service Awards to the Class Representatives.  3M Class members submitted claims for eligibility for a pro rata share of the cash fund (the total fund, minus costs, divided by the total number of claims).  If there are any remaining funds after the initial distribution, a second round of checks will also be allocated on a pro rata basis to the claimants who have cashed their settlement checks or accepted their digital payments.

### c.     Notice to the 3M Settlement Class

---

[11] The Settlement provides that unconfirmed claims will receive half of a pro rata share. An unconfirmed claim is a claim submitted attesting to membership in the Settlement Class but whose identifying information does not allow the Class Administrator to either confirm or reject membership in the Settlement Class.

As described above, and consistent with the Preliminary Approval Order, 3M Class Members received a single notice describing both the TCA Class Settlement and the 3M Class Settlement and allowing them to make claims in either or both settlements.

### d.      Proposed 3M Class Representative Service Awards

Consistent with the Order on Preliminary Approval, Class Counsel filed a motion for payment of attorneys' fees, costs and service awards on October 26, 2021 (*see* Docket No. 611). These Plaintiffs have been enthusiastic and active class representatives. They have participated in the prosecution of this action by: reviewing and approving their original complaints and the Consolidated Complaint; sitting for a full-day deposition; responding to multiple lengthy sets of written discovery including ones that delved into their finances; communicating regularly with class counsel; submitting declarations in opposition to Defendants' motions for summary adjudication; and generally staying informed about the progress of the litigation and acting in the interests of the proposed classes. Each put their name and reputation on the line for the sake of the Class, and no recovery would have been possible without their critical role. See, Dkt. 611-1 ¶57.  The proposed $3,000 service awards per class representative are consistent with those approved in other consumer class action settlements that have been pending as long as this one has.

### 3.      Attorneys' Fees and Costs

As part of the Settlement, Class Counsel stated that they would not seek an award of fees in excess of one-third of the Settlement Value. (3M Settlement Agreement ¶ 5.01). The Settlement Value is $11.95 million. Consistent with that aspect of the settlement, Class Counsel's fee request is $2,987,500 from the 3M, which is 25% of the Settlement Value. Such a request is consistent with the Ninth Circuit's 25% "benchmark" for such awards. See, generally, Memorandum in Support of Plaintiffs' Motion for Attorneys' Fees, Costs and Service Awards, Docket No. 611.

Consistent with the Order on Preliminary Approval, Class Counsel filed a motion for payment of attorneys' fees, costs and service awards on October 26, 2021 (*see* Docket No. 611). As that motion makes clear, the approximately $2.99 million sought is reasonable as a percentage of the fund and is also commensurate with the lodestar attorneys' fees plus expenses incurred in this matter. Class Members have had the opportunity to comment on or object to the fee petition under Rule 23(h), consistent with Ninth Circuit authority. *See Mercury Interactive Corp. Sec. Litig. v. Mercury Interactive Corp.*, 618 F.3d 988, 993-94 (9th Cir. 2010).

### 4. The 3M Settlement Administrator

As with the TCA Settlement, consistent with the Preliminary Approval Order, Epiq has served as the Settlement Administrator. The total costs of the Settlement Administrator will be paid out of the Settlement Fund. The Settlement Administrator will submit its costs for this Settlement in a Supplemental Declaration.

### C. The OCTA Settlement

#### 1. The Settlement Class Definition

The proposed Settlement Class is similar to the class certified as to the OCTA Defendants. It consists of the following individuals whose PII was provided by OCTA or Cofiroute to an entity described below between June 29, 2015 and May 27, 2021 (10 days after preliminary approval was granted):

• Any person with a non-OCTA transponder account whose PII, including the date, time and location of a toll transaction, was sent by OCTA or Cofiroute to the TCA or other California toll agency for purposes of collecting a toll incurred on the 91 Express Lanes (the "Interoperability Subclass");

• Any person whose license plate number was sent by OCTA or Cofiroute to the California Department of Motor Vehicles or out-of-state equivalent, directly or through a subcontractor, in connection with more than one alleged toll violation incurred on the 91 Express Lanes (the "DMV Subclass")

- Any person whose PII was sent by OCTA or Cofiroute to a car rental company in connection with an alleged toll violation incurred on the 91 Express Lanes (the "Car Rental Subclass"); and

- Any person whose PII, other than the amount of tolls and penalties owed, the violation number, or the violator's account number, was sent by OCTA or Cofiroute to a third-party debt collector for collection of unpaid tolls and/or toll violation penalties incurred on the 91 Express Lanes (the "Debt Collection Subclass").

The following individuals are excluded from the Settlement Class: Current members of the OCTA Board of Directors, OCTA's Chief Executive Officer, the General Manager of the 91 Express Lanes, OCTA's 91 Express Lanes Project Manager III, the attorneys representing OCTA and Cofiroute in this Litigation. and the judge to whom this case is or was assigned, any member of the judge's immediate family, and any member of the judge's staff.

## 2.  The Settlement Benefits

The total settlement includes $1 million dollars in cash, $40 million dollars in penalty forgiveness, and programmatic relief, including a reduction in OCTA's maximum toll violation penalty.  Specifically, the settlement provides:

### a.  Cash Payments

OCTA will contribute $1 million dollars to a cash settlement fund. Subject to the Court's approval, the cash contribution will be used to fund the Cash Awards, class notice and administration costs, cost of the Special Master, any attorneys' fees awarded to Class Counsel, and Service Award to the Class Representative. The remainder (after deduction of fees, costs and Service Award) will be distributed: 1) on a pro rata basis to the members of the Debt Collection Subclass who are not eligible for penalty forgiveness because they do not have outstanding unpaid penalties and who submitted valid claims,

up to a maximum of $15.00 per person; 2) any remaining funds will be donated to Privacy Rights Clearinghouse as a *cy pres* award.

### b.     Penalty Forgiveness

OCTA will also provide a substantial $40 million dollars in penalty forgiveness to Debt Collection Subclass Members with outstanding penalties ("Penalty Forgiveness Eligible Class Members").  The penalty forgiveness amount will be distributed in two steps:  First, all penalties owed as of the Settlement Class Period End Date by Penalty Forgiveness Eligible Class Members will be reduced to $100.00 per violation (from a current maximum of between $150 and $190). Second, the remainder of the $40 million penalty forgiveness fund will be allocated on a per capita basis to all Penalty Forgiveness Eligible Class Members and applied to the remaining balance of their outstanding penalties,

Approximately 25% of all toll violators on the 91 Express Lanes are referred for debt collection. The other 75% of violations are resolved by Cofiroute.  It is estimated that there is approximately $92 million owed by members of the Debt Collection Subclass. Cofiroute's subcontracted debt collection agency continues active measures to collect this debt. Any debt over $5,000 that is not resolved by the debt collection agency is reduced to a judgment, and judgments are renewed if they remain unresolved. Another method for collecting unpaid tolls and penalties is a tax refund intercept with the Franchise Tax Board.

There is no requirement to submit a claim form to receive penalty forgiveness - it will be electronically credited to the violation accounts of the Penalty Forgiveness Eligible Class Members. For debts that have been reduced to judgments, partial satisfaction of judgments will be filed.

### c.     Remedial Measures Attributable to the Settlement

In addition to the cash and penalty forgiveness, as additional benefits of the settlement, OCTA will reduce the maximum per-violation penalty to $100.00 from a

maximum penalty of 20x the highest system wide toll. The highest the toll penalty has been during the class period is $195.00. In addition, absent a change in existing California law regarding the PII that can be provided to a third-party debt collector, and without conceding that a unique violator ID number assigned to each toll violator is PII, the Parties have agreed that the only PII of toll violators that OCTA or Cofiroute will provide to a subcontracted third-party debt collector will be the information contained in the relevant toll violation notice(s), together with any updated contact, address and/or email information, and a unique toll violator identification number assigned by Cofiroute.

### 3.    Notice to the Class

Pursuant to Rule 23(c)(2)(B), the Settlement Administrator provided Settlement Class Members with settlement notice as follows:

- Members of the Debt Collection Subclass and those members of the Interoperability Subclass for whom TCA did not have email addresses were sent postcard notice via U.S. mail to the Class Member's last known address. (Settlement Agreement ¶8.01; Declaration of Cameron R. Azari, Esq. on Implementation and Adequacy of OCTA Notice Plan ("Azari OCTA Decl.") ¶7.) The mailed settlement notice contained a detachable claim form allowing participating eligible Class Members to claim in for a cash distribution. The mailed settlement notice also provided the web address for the website where Class Members were able to electronically submit a claim form.

- Members of the Interoperability Subclass for whom TCA provided names and email addresses were emailed written settlement notice. *Id.* Settlement Class Members who received settlement notice by email received a link in the email that took them directly to the settlement website, which contains the long form of the settlement notice.

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS

- For the remaining Settlement Class members, settlement notice was provided by print publication and social media. *Id.* This included toll violators who had their license plate numbers submitted more than once to the DMV, individuals who incurred toll violations while driving a rental car, and individuals with an account with another California toll agency other than TCA who paid a toll through the interoperability system for whom no contact information is reasonably available.

### 4.    Proposed Class Representative Service Award

Consistent with the Order on Preliminary Approval, Class Counsel filed a motion for payment of attorneys' fees, costs and service awards on October 26, 2021 (*see* Docket No. 611). Subject to the Court's final approval, Class Counsel now seek a payment of $5,000 as a service award to Daniel Golka for his service as Class Representative. (Settlement Agreement ¶ 4.01).  Mr. Golka has been an enthusiastic and active class representative. He has actively participated in the prosecution of this action by: reviewing and approving his original complaint and the Consolidated Complaint; sitting for a full-day deposition; responding to multiple lengthy sets of written discovery; communicating regularly with Class Counsel; submitting a declaration in opposition to OCTA and Cofiroute's motions for summary adjudication; and generally staying informed about the progress of the litigation and acting in the interests of the proposed Class. He put his name and reputation on the line for the sake of the Class, and no recovery would have been possible without his critical role. See Dkt. 611-1 ¶ 57.  The proposed $5,000 service award is consistent with those approved in other consumer class action settlements that have been pending as long as this one has.

### 5.    Attorneys' Fees and Costs

The settlement value of the monetary component of the settlement is $41 million, which includes cash and monetary forgiveness. Consistent with the Settlement Agreement, Class Counsel request $250,000 in fees.  This amount represents one-quarter

of the settlement fund and less than 1% of the monetary components of the settlement. Such a request is well below the Ninth Circuit's 25% "benchmark" percentage for such awards. *See generally,* Memorandum in Support of Plaintiffs' Motion for Attorneys' Fees, Costs and Service Awards, Docket No. 611. Nonetheless, an upward adjustment above the benchmark percentage would have been warranted under these circumstances.

Consistent with the Order on Preliminary Approval, Class Counsel filed a motion for payment of attorneys' fees, costs and service awards on October 26, 2021 (*see* Docket No. 611). As that motion makes clear, the $250,000 sought from the OCTA Settlement is reasonable as a percentage of the fund and is also commensurate with the substantial lodestar incurred in this matter.

### 6.    The Class Administrator

As with the TCA and 3M Settlements, and consistent with the Preliminary Approval Order, Epiq has served as the Settlement Administrator for the OCTA Settlement. The total costs of the Settlement Administrator[12] will be paid out of the Settlement Fund. The Settlement Administrator will submit its costs for this Settlement in a Supplemental Declaration.

### IV.    CAFA Notice and Notice to the Classes

After the Settlements were finalized, Epiq sent notification in compliance with the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715. Azari TCA Decl. ¶9; Azari OCTA Decl. ¶9.

Pursuant to the Preliminary Approval Orders (Docket Nos. 599 and 600), Epiq provided notice to the Classes through a dedicated website and toll-free number, relevant media outlets, banner ads on social media, and direct notice to Class Members via U.S. Mail or e-mail. Azari TCA Decl., at ¶¶s 23-45, and Azari OCTA Decl., at ¶¶s 24-45.

### V.    THE REACTION OF THE CLASS MEMBERS TO THE SETTLEMENTS HAS BEEN OVERWHELMINGLY POSITIVE

The Settlements have been well received by class members.  Out of approximately 15 million notices sent, over a million Claim Forms have been submitted, with 739,144 claims filed under the TCA Settlement, 299,263 claims filed under the 3M Settlement and 296,841 claims filed under the OCTA Settlement. Azari TCA Decl. ¶48; Azari OCTA Decl. ¶47.  Only 485 Class Members requested exclusion to date,[13] and only one Class Member filed an objection (Docket No. 612) and that objection was only to the TCA Settlement. No objection was made by any State official of any State in which a class member resides. "A small number of objections and opt-outs at the time of the fairness hearing may raise a presumption that the settlement is favorable to the class." *In re Vizio, Inc.*, No. 8:16-ml-02693-JLS-KES, 2019 U.S. Dist. LEXIS 239976, at *32 (C.D. Cal. July 31, 2019) citing *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008); s*ee also Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 221862, at *5 (N.D. Cal. Jan. 26, 2007) (approving a settlement where the opt-out rate was 2%), *aff'd*, 331 F. App'x 452 (9th Cir. 2009).

## VI.     THE SETTLEMENT CLASSES SHOULD BE CERTIFIED

As the Court found at the preliminary approval stage, the Settlement Classes are appropriate for certification under Rule 23(a) and 23(b) in this settlement context. (ECF Nos. 599 and 600). Because no substantive changes have occurred since that finding, and no objections or other arguments have been raised in opposition to a finding of certification, the Court's previous findings should be made final here. *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 887 (C.D. Cal. 2016) ("Because circumstances have not changed, and for the reasons set forth in its Order of November 12, 2015, the court hereby affirms its order certifying the class for settlement purposes under Rule 23(e).") (citing *In re Apollo Grp. Inc. Sec. Litig.*, No. 04-2147, 2012 WL 1378677, *4

---

[13] The Settlement Administrator will provide a Supplemental Declaration including the total number of exclusions received after the filing of this Motion as well as the names of all opt-outs.

(D. Ariz. 2012) ("The Court has previously certified, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and hereby reconfirms its order certifying a class."))[14]

Before assessing the parties' settlements, the Court should first confirm that the underlying settlement classes meet the requirements of Rule 23. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997); Manual for Complex Litigation, § 21.632. The requirements are well known: numerosity, commonality, typicality, and adequacy-each of which is met here. Fed. R. Civ. P. 23(a); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). The Court has previously found when granting Preliminary Approval that these requirements were met and nothing has happened since that should disturb those findings. Accordingly, for those reasons and the reasons stated below, the Court should finally certify the Settlement Classes.

## VII. THE SETTLEMENTS SHOULD BE FINALLY APPROVED

### A. Rule 23(e) Analysis

Amended Rule 23(e) standardizes the factors governing final approval, stating that approval is proper upon a finding that the settlement is "fair, reasonable, and adequate" after considering whether:

(A) the class representatives and class counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;
(C) the relief provided for the class is adequate, taking into account:
 (i) the costs, risks, and delay of trial and appeal;
 (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
 (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
 (iv) any agreement required to be identified under Rule 23(e)(3); and
(D) the proposal treats class members equitably relative to each other.

---

[14] Plaintiffs incorporate by reference their prior arguments regarding certification of the Settlement Classes, as set forth in the Motions for Preliminary Approval, rather than repeating them here. (ECF No 585-1 and 594-1)

Fed. R. Civ. P. 23(e)(2).

The applicable standard for preliminary approval also now incorporates these factors, which Plaintiffs and the Court analyzed at the preliminary-approval stage, along with the Ninth Circuit's factors for final approval which Plaintiffs incorporate by reference.

As previously established, Named Class Representatives and Class Counsel have adequately represented the Class (FRCP 23(e)(2)(A)). *See* Order Granting Class Certification (Docket No. 501 at 10-11; *see also* Orders Granting Preliminary Approval of Settlement, Docket Nos. 599 and 600.

The settlement was negotiated at arm's length over the course of the litigation using experienced neutrals (FRCP 23(e)(2)(B)). Zeldes Decl. ¶ 14-16.  *See, e.g., Satchell v. Fed. Exp. Corp.*, Nos. 03-cv-2659-SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.") The settlement was finalized only after discovery had been completed and the parties were on the brink of trial.

Plaintiffs and the Court both analyzed the factors under FRCP 23(e)(2)(C) in the context of Preliminary Approval and found that the relief provided to the classes is adequate. *See* Docket Nos. 599 and 600. Further, Plaintiffs stated in their motion for attorneys' fees the amounts they are seeking for attorneys' fees and that they are entitled to those fees based on a percentage of the relief achieved for class members. *See* Docket No. . The timing of payment of any such awarded fees would be at or around the same time as Cash Awards are distributed to Class Members.

As discussed in the context of Preliminary Approval, the settlement proposals treat class members equitably relative to each other (FRCP 23(e)(2)(D)). *See* Plaintiffs' Memoranda in Support of Preliminary Approval, Docket Nos.585-1 and 594-1.

**B.      Ninth Circuit Final Approval Factors**

Amended Rule 23 reflect many of the factors already used in this Circuit for final approval: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; (8) the reaction of the class members to the proposed settlement; and (9) whether  the settlement is a product of collusion among the parties. *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). Plaintiffs addressed most of these factors in their preliminary approval briefing and incorporate those arguments here by reference.  *See* Plaintiffs' Memoranda in Support of Preliminary Approval, Docket Nos.585-1 and 594-1. The Court also analyzed those factors and agreed with Plaintiffs. *See* Docket Nos. 599 and 600. Because only factors (7) and (8) have the potential for evolution since the preliminary approval stage, with all others being previously addressed, they are further detailed below.

### i.     *The Presence of a Government Participant*

Pursuant to the Notice Plans, the Attorney General of the United States, and the 51 Attorneys General as well as the five territories were notified pursuant to CAFA, 28 U.S.C. § 1715, and given an opportunity to raise any objections.  Azari TCA Decl. ¶9; Azari OCTA Decl. ¶9.  Currently, no such objections have been received.

### ii.     *The Reaction of the Class Members to the Proposed Settlement Has Been Overwhelmingly Positive.*

The reaction of the Class Members to the Settlements has been overwhelmingly positive. Epiq sent approximately 15 million notices to potential class members.  Over a million made claims seeking benefits.  Only 485 requests for exclusion were filed, along with only one objection to the TCA Settlement only [Docket No. 612].

The objection to the TCA Settlement contends that: (1) class counsel are not

entitled to the fees requested, and (2) that the programmatic relief is insufficient. Plaintiffs will respond in due course on or about December 21, 2021, consistent with the Court's briefing schedule, but the objection should be overruled.  First, Class Counsel were able to successfully litigate this complex matter and achieve Settlements that provide substantial benefits for the Class Members.  Class Counsel previously provided the Court with information substantiating the award of fees.  *See* Motion of the Plaintiffs Class for Attorney's Fees and Expenses (Docket No. 611).  In addition, the objector's contention that the programmatic relief in the TCA Settlement is not valuable is meritless.  The TCA Toll Roads have made meaningful changes to their operating procedures, which Class Counsel have previously described. *See* Docket No. 585-1.

## VIII.  THE NOTICE PLANS MET THE REQUIREMENTS OF DUE PROCESS

In any proceeding that is to be accorded finality, due process requires that interested parties be provided with notice reasonably calculated, under the circumstances, to apprise them of the pendency of the action and afford them an opportunity to present their objections.  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). That means the settlement notices must fairly apprise the class members of the terms of the proposed compromise and give class members sufficient information to decide whether they should accept the benefits offered, opt out and pursue their own remedies, or object to the settlement. *Id*. Additionally, the notice must be designed to have a reasonable chance of reaching a substantial percentage of the class members. *Id.* at 318 (explaining notice must be reasonably calculated to reach interested parties). For classes certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Under amended Rule 23(c)(2)(B), "[t]he notice may be by one or more of the following: United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B) (effective Dec. 1, 2018).

Here, as explained above, the Notice Plans were implemented as anticipated and, between the multiple notice methods including direct mail, e-mail, and social media, likely reached approximately 93% of identifiable class members for the 3M and TCA Settlements and 95% of identifiable class members for the OCTA Settlements. Accordingly, the Court should find the Notice Plans were reasonably calculated to give actual notice to Class Members of the right to receive benefits from the Settlements, and to be excluded from or object to the Settlements and that the Notice Plans met the requirements of Rule 23 and due process.

## IX. CONCLUSION

For the foregoing reasons, the Court should overrule the only filed objection to the TCA Settlement, grant final approval to all of the Settlements and enter judgment. Plaintiffs request that the Court enter its Orders and Judgments substantially in the form of the Proposed Orders and Judgments lodged with this Motion.

Dated: December 7, 2021

SCHONBRUN     SEPLOW     HARRIS
HOFFMAN & ZELDES, LLP

HELEN I. ZELDES (SBN 220051)
*hzeldes@sshhzlaw.com*
BEN TRAVIS (SBN 305641)
*btravis@sshhzlaw.com*
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 400-4990
Facsimile: (310) 399-7040

LINDEMANN LAW FIRM, APC
BLAKE J. LINDEMANN, SBN 255747
433 N. Camden Drive, 4th Floor
Beverly Hills, CA 90210

1
2

Telephone: (310) 279-5269
Facsimile:  (310) 300-0267
E-Mail:       blake@lawbl.com

3
4
5
6
7

**CUNEO GILBERT & LADUCA, LLP**
MICHAEL J. FLANNERY (SBN 196266)
500 North Broadway, Suite 1450
St. Louis, MO 63102
Telephone: (314) 226-1015
Fax:            (202) 789-1813
E-Mail:       mflannery@cuneolaw.com

8
9

*Co-Lead Class Counsel*

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

32